LOUISVILLE & N. R. Co. *v.* RAILROAD COMMISSION OF TENNESSEE.

EAST TENNESSEE, V. & G. R. Co. *v.* SAME.

*(Circuit Court, M. D. Tennessee.* February 29, 1884.)

1. RAILROADS—LEGISLATIVE CONTROL.
    Railroads having been created mainly for the accommodation of the public, and to facilitate the business of the country, and being indispensable to the rapid and cheap transportation of commodities, are subject to legislative control within the limits of state and federal constitutional restrictions, and may be required by law to refrain from so using their property as to injure others, and by appropriate pains and penalties may be restrained from unjust discrimination and extortionate charges, compelled to observe precautionary measures against accident, and in other ways regulated for the public welfare.

2. SAME—VESTED RIGHTS.
    But the legislation adopted must observe the contract rights of corporations under their charters; must be confined to the exercise of the *police power,* and not interfere with the vested rights of the companies in their property or franchises; must not inflict punishment or take property otherwise than by due process of law nor without compensation; must not deny to them the equal protection of the law; and must in all respects observe the constitutional guaranties prescribed for the protection of all citizens—railroad companies being for such purposes as much citizens as natural persons.

3. SAME—TENNESSEE ACT OF MARCH 30, 1883—UNCERTAINTY OF THE ACT—CONSTITUTIONAL LAW.
    The act of the general assembly of Tennessee of March 30, 1883, to establish a railroad commission analyzed, and *held* to be invalid because its provisions are too indefinite, vague, and uncertain to sustain a suit for the penalties imposed, and do not sufficiently define the offenses therein declared. It leaves to the jury to say whether, upon the proof, the difference in rates amounted to discrimination, or whether the charges were unjust and unreasonable, thus making the guilt or innocence of the accused depend upon the finding of a jury,

and not upon a construction of the act. It relegates the administration of the law to the unrestrained discretion of the jury, and there could be therefore no reasonable approximation to uniform results, but verdicts would be as variant as their prejudices, and inevitably lead to inequalities and injustice.

4. SAME—STANDARD PRESCRIBED BY THE ACT.

Neither is the objection to the act for uncertainty removed by its attempt to prescribe a standard of compensation for the guidance of the jury. It does not with precision point out the assessment for taxation which is to furnish the basis of judgment, nor prescribe the rule under which the net earnings are to be computed. But if these difficulties were overcome, there remains no method of measuring what is a "fair and just return" on the value of the property of the companies which they are allowed to earn before becoming liable to the penalties of the statute, but the act leaves it to the unqualified discretion of the jury, whose verdicts may vary not only as between different companies, but as between different suits with the same company. One jury may fix it at one rate per cent., and others at different rates, so that no company could tell whether it was violating the law or not, and the fact would be determined by the fluctuating contingencies of business, and a charge made on the calculation that 6 per cent. would be fair, might, by the verdict of a jury, upon facts transpiring subsequent to the alleged violation, be pronounced unreasonable and unjust. The legislature cannot delegate such power to a jury without a practical confiscation of the citizen's property.

5. SAME—CONSTITUTION OF TENNESSEE, ART. 11, § 8—CONSTITUTION OF UNITED STATES, FOURTEENTH AMENDMENT.

The act violates the eighth section of the eleventh article of the state constitution and the fourteenth amendment of the constitution of the United States. It discriminates against railroad *corporations*, in its third and thirteenth sections, by imposing upon them penalties in favor of the state, which are not imposed for like offenses or conduct upon other persons operating railroads in the state, although the act professes to regulate both. It also, in the twenty-ninth section, discriminates in favor of roads not completed, or the construction of which has not commenced, by exempting them from regulation and punishment for 10 years. The act also reverses the presumption of innocence, and substitutes one of guilt, to be removed only by the accused proving innocence, and puts the power to raise this presumption in the hands of three commissioners, who can, by their act, place the burden on the accused, or leave it off, and arms them with authority to enforce their decree by imposing penalties, which may amount to the taking of private property without compensation. Besides, it enables a political party to bring to its aid the immense railroad property and influence, by action through the commissioners, which shall be friendly or unfriendly, as the railroad companies favor one party or the other.

Per BAXTER, J.

6. SAME—INTERSTATE COMMERCE—STATE REGULATION OF RAILROAD RATES.

The act of the Tennessee legislature, approved March 30, 1883, *c.* 199, entitled, "An act to provide for the regulation of railroad companies and persons operating railroads in this state, to prevent discrimination upon railroads in this state, and to provide for the punishment of the same, and to appoint a railroad commission," is invalid so far as it applies to the plaintiffs in these cases, because it is a regulation of interstate commerce, acting directly, by a control of the rates of compensation, upon the transportation of persons and commodities in transit from one state into another. The states have surrendered the power to do this by the federal constitution, art. 1, § 8, which confers on congress the exclusive power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

7. SAME—POWER OF THE STATES DEFINED.

The power of the states to regulate railroad rates by such direct action is limited to domestic transportation, which means that carried on exclusively within the boundaries of a state, and transportation can be domestic only when it begins and ends within those boundaries; and this definition cannot, for the purpose of enlarging state authority, be held to include so much of a transportation on a continuous shipment between two or more states as will cover the

distance traveled within the limits of any one of those states; for this construction would utterly destroy the exclusive power of congress over the interstate transportation, abrogate the constitutional provision, and enable the states to restrict, obstruct, or impair that freedom of commerce between the states which it was the object of the provision to permanently secure. It can only include the transportation carried on upon roads lying wholly within the state, or else it may be to shipments beginning and ending in the state, without reference to the character of the road in that regard. This is the utmost reach of state power, and, as to this, no decision is now made, because the act itself makes no discrimination, and attempts to control *all* rates.

8. SAME—REGULATING THE INSTRUMENTALITIES OF COMMERCE—INVALID STATUTES—WHEN WHOLLY VOID.

Until congress chooses to exercise whatever power it may have over domestic commerce, as above described, by reason of any relation it may bear to interstate commerce as an auxiliary or instrumentality thereof, the states may continue their control over it as over any other such instrumentality within their territorial limits, although the interstate commerce of which it is an instrumentality may be indirectly or incidentally affected by such control, but they can never touch the interstate commerce itself by direct action upon it or any part of it, by these regulations, and any state law, be it wise or unwise, valid or invalid in other respects, and no matter what its character or the necessity for such a law may be, which acts upon the contract between the carrier and shipper for interstate transportation to regulate the charges for it, or any part of it, or the conditions thereof in any respect, operates directly on the commerce itself, of which the transportation is certainly a part, and not on an instrumentality of it. These distinctions must be observed in legislation, and that which neglects or overlooks them, or assumes to disregard them, is necessarily invalid; and the courts cannot cure the defect by supplying through judicial decree the necessary qualifications to conform the legislation to constitutional limitations.

9. SAME—POWER TO REGULATE CORPORATIONS.

It is as impossible for a state to make a regulation of interstate commerce by the exercise of its power over the corporations of its creation as by any other power, if it permits them to engage in interstate commerce. Possibly, it may bind the corporations permitted to engage in interstate commerce to schedules of rates *agreed* upon by them; but this is binding only by force of the contract of the carrier to be so bound, and not as a regulation of the rates under any municipal power of the states over the commerce. A regulation of interstate commerce, *as such*, is as invalid in a charter as elsewhere in a state statute.

10. SAME—CASE IN JUDGMENT.

The Louisville & Nashville Railroad Company, being a Kentucky corporation, was authorized by license of the laws of Tennessee to extend its road into that state; and, subsequently, by laws passed for the purpose, to consolidate with other railroad companies, and thereby became an extensive system of intercommunication between the states from the Ohio river to the Gulf of Mexico. The East Tennessee, Virginia & Georgia Railroad Company, a Tennessee corporation, by authority of law, became a consolidated corporation, operating a system of railroads between the states and extending through Tennessee into Georgia, Alabama, and Mississippi, forming with its connections a united line of intercommunication, traversing North and South Carolina, Virginia, and other states *Held*, that an act of the legislature which attempts to control the rates for fares and freights of persons and commodities passing over these roads from one state into another, on the theory of regulating the charges for the distances traveled within the state of Tennessee. is invalid as a regulation of interstate commerce, and the railroad commissioners will be enjoined from executing it as to these roads.

Per HAMMOND, J.


## Application for Preliminary Injunction.

The Louisville & Nashville Railroad Company filed its bill alleging that it was a Kentucky corporation, extending its road into the

state of Tennessee by authority of the laws of the latter state; that by other laws passed for the purpose it had been authorized to acquire and to consolidate with other roads extending into neighboring states; that by its charter, and the charters of the other roads so acquired by it, there were fixed certain maximum rates of charges for transportation, which conferred a contract right to establish its own rates within the maximum, which had not been exceeded by it. The East Tennessee, Virginia & Georgia Railroad Company, by its bill, alleged that it was a Tennessee corporation, authorized by law to consolidate its roads with others, and operating a system of roads extending into neighboring states, and that by its charter there were fixed certain maximum rates which conferred upon it the contract right to establish its own rates within the maximum, and which it had not exceeded. Both bills alleged that the defendants had been appointed railroad commissioners, and were assuming to act by authority claimed under the act of the general assembly of the state of Tennessee, approved March 30, 1883, which is as follows:

"*Chapter CXCIX.*

"RAILROAD COMMISSION BILL.

"A bill to be entitled 'An Act to provide for the regulation of railroad companies, and persons operating railroads in this state; to prevent discrimination upon railroads in this state; and to provide for the punishment for the same; and to appoint a railroad commission.'

"Section 1. Be it enacted by the general assembly of the state of Tennessee, that the main track and all the branches of every railroad in this state is a public highway, over which all persons have equal rights of transportation for passengers and freights, on the payment of just and reasonable compensation to the owner of the railroad for such transportation; and any person or corporation engaged in the business of transporting passengers or freights over any railroad in this state who shall exact and receive for any such transportation more than just and reasonable compensation for the services rendered, or demand more than the rates specified in any bill of lading issued by such person or corporation, or who for his or its advantage, or for the advantage of any connecting line, or of any person or locality, shall make any unjust and unreasonable discrimination in transportation against any individual, locality, or corporation, shall be guilty of extortion, and in every case it shall be for the jury to determine from all the evidence whether more than just and reasonable compensation was exacted and received, or whether any such discrimination in transportation, which may be established by the evidence, against the individual, locality, or corporation, as the case may be, was made for the benefit or advantage of the person or corporation operating such railroad, or of any person or locality: provided, that nothing in this act shall be construed to prevent contracts for special rates for the purpose of developing any industrial enterprise, or to prevent the execution of any contract now existing.

"Sec. 2. Be it further enacted, that the party injured may recover of the person or corporation guilty of extortion, as defined in this act, ten times the amount of damages sustained by the overcharge or unjust discrimination, as the case may be, and a reasonable fee for the counsel prosecuting the case in any court having jurisdiction of the amount, in any county where the person or corporation operating the railroad does business; but if it appears that the service in which the extortion was committed was done at rates or upon terms

previously approved by the railroad commission hereinafter established, **only** actual damages, and no attorney's fee, shall be recovered.

"Sec. 3. Be it further enacted, that it shall be the duty of the commission to investigate and determine whether the provisions of this bill have been violated; and whenever said commissioners shall become satisfied that any railroad corporation has violated any of the provisions of this act, they shall immediately cause suit or suits to be commenced and prosecuted against any railroad corporation guilty of such violation in any court having jurisdiction of the subject-matter. Said suit shall be prosecuted in the name of the state of Tennessee, and conducted by the attorney general of the judicial circuit in which the same is instituted, under the direction of said commissioners, and no suit so instituted shall be dismissed without their consent. All moneys so collected shall be paid into the state treasury. If upon the trial of any cause for the recovery of the penalties provided in this bill, the jury shall find for the state, they shall assess and return with their verdict the amount of the penalty to be imposed on the defendant at any amount not less than $100, nor more than $1,000, and the court shall render judgment accordingly.

"Sec. 4. Be it further enacted, that in all suits or proceedings under this statute the defendant may give in evidence the fact that the rates or terms in respect to which extortion is alleged had been previously approved by the railroad commission hereinafter established, and such approval shall be *prima facie* evidence that such rates or terms were not extortionate.

"Sec. 5. Be it further enacted, that no rates or charges for service in the transportation of freight over any railroad shall be held or considered extortionate or excessive under any proceeding under this act, if it appears from the evidence that the net earnings of such railroad transporting freight, if done without such discrimination on the basis of such rate or charge, together with the net earnings from its passenger and other traffic, would not amount to more than a fair and just return on the value of which such railroads with its appurtenances and equipments to be assessed for taxation.

"Sec. 6. Be it further enacted, that all actions to recover damages under this act shall be commenced within six months after the cause of action accrues.

"Sec. 7. Be it further enacted, that the foregoing sections of this act shall not take effect until the first day of July, 1883.

"Sec. 8. Be it further enacted, that it shall be the duty of all persons or corporations in this state, who shall own or operate any railroad therein, to publish by posting at all the depots the tariffs of rates, which have been approved by said commission for transporting freights, showing the rates for each class, including general and special rates, and it shall be unlawful for such person or corporation to make any reduction or rebate from such tariff in favor of any person or corporation which shall not be made in favor of all other persons or corporations by a change in such published rates.

"Sec. 9. Be it further enacted, that it shall be unlawful and within the prohibition of this act for any railroad corporation doing business in this state, to make any contract, agreement, or arrangement with any other railroad corporation, or with any common carrier by water in respect to the transportation of freights of any description, from any place within this state by which it is to transport only a certain portion of such freights, or by which it is to refuse to transport such freights or any portion thereof, or by which any common carrier by water is to refuse to transport such freights or any portion thereof, or by which it is to receive any sum of money, or anything of value for not transporting all or any part of such freights, or by which it is to pay any sum of money, or part with anything of value as an inducement to any other railroad corporation or common carrier by water not to compete with it in the transportation of such freights, or by which it and other railroad corpo-

rations or common carrier by water, distribute among themselves for transportation, according to percentages, any freights offered for shipment; and railroad corporations are required to remove freights when delivered or offered for shipment to the extent of their facilities without unnecessary delay and without regard to any contract, agreement, or arrangement expressed or implied as aforesaid, and all railroad corporations refusing or neglecting so to do are hereby declared to be subject to the penalties imposed by this act.

"Sec. 10. Be it further enacted, that this act shall not prevent any railroad company from transporting freight free of charge, provided it is not done to evade the provisions of this act.

"Sec. 11. Be it further enacted, that it shall be the duty of the governor to nominate three competent persons, one from each grand division of the state, subject to the confirmation of the senate, if in session, who shall constitute the railroad commission of the state of Tennessee, and the commissioners, after qualifying, as prescribed in section 11 of this act, shall proceed to elect one of their number as president and one as secretary; and said commissioners shall hold their offices until the first day of January, 1885, and their successors shall be elected by the qualified voters of the state at the November election, 1884, and every two years thereafter.

"Sec. 12. Be it further enacted, that the said railroad commissioners shall be state officers, and before entering on their duties shall take the oath of office prescribed for other state officers, and may be impeached and removed from office for the same causes, and in the same manner, as other state officers.  They shall hold office for two years and until their successors respectively are duly elected or appointed and qualified, and any vacancy shall be filled by the governor; the person so appointed shall hold office until his successor is duly appointed, confirmed, and qualified as above provided.  No person in the employ of any railroad corporation, or other person, owning or operating a railroad in this state, or owning any stock in any railroad corporation, shall be nominated by the governor as a member of such commission, and any commissioner who shall accept any gift, gratuity, or emolument, or employment from any person or corporation owning or operating a railroad in this state, during his continuance in office, except a permit for himself to pass over the railroad of such person or corporation, shall forfeit his office, and may be impeached and removed from office for that cause, as well as any of the causes specified by law for the impeachment of other state officers.

"Sec. 13. Be it further enacted, that it shall be the duty of the commission to consider and carefully revise all tariffs of charges for transportation of any person or corporation owning or operating a railroad in this state, and if, in the judgment of the commission, any such charge is more than just and reasonable compensation for the service for which it is proposed to be made, or if any such charges amount to unjust and unreasonable discrimination against any person, locality, or corporation, the commission shall notify the person or corporation of the changes necessary to reduce the rate of charges to just and reasonable compensation, and to avoid unjust and unreasonable discrimination; when such changes are made or when none are deemed proper and expedient, the members of the commission shall append a certificate of its approval to such tariff or charges, and in case such change shall not be made, or if any charge subsequently made shall not conform thereto, said corporation shall be held *prima facie* guilty of extortion.

"Sec. 14. Be it further enacted, that it shall be the duty of said commission to hear all complaints made by any person against any such tariff or rates so approved, on the ground that the same in any respect is for more than just and reasonable compensation, or that such charges, or any of them, amount to or operate so as to effect unjust and unreasonable discrimination, such complaint must be in writing and specify the items in the tariff against which

complaint is made, and if it appears to the commission that there may be justice in the complaint, or that the matters ought to be investigated, the commission shall forthwith furnish to the person or corporation operating the railroads a copy of the complaint, together with notice that, at a time and place stated in the notice, the tariff as to said items will be revised by the commission, and at such time and place it shall be the duty of the commission to hear the parties to the controversy, or by counsel, and such evidence as may be offered, oral or in writing, and may examine witnesses on oath, conforming to the mode of proceedings as nearly as may be convenient to that required of arbitrators, giving such time and latitude to each side, and regulating the opening and conclusion of any argument as the commission may consider best adapted to arrive at the truth, and when the hearing is concluded, the commission shall give notice of any changes deemed proper by them to be made, to the person or corporation operating the railroad. And any subsequent charge higher than the amount fixed shall be *prima facie* evidence of extortion. And all railroad companies or persons operating railroads in this state shall make out and deliver for revision to the commissioners a schedule of their rates of charges for the transportation of freights, cars, and passengers, within twenty days after the president or superintendent is notified by the commissioners that they are ready to consider the same, and on failure to do so, said railroad company, or other persons so operating said railroad, shall be liable to a fine of $100 for every day of said failure after the expiration of said twenty days; and said railroad company or other persons operating any railroad shall have the right to appear and make such proof as they may desire in regard to revision by said commissioners, under such regulations as the commissioners may prescribe.

"Sec. 15. Be it further enacted, that said commission shall have an office at the capital, and shall meet there on the first Monday in every month, and shall remain in session until all business before them is disposed of; and shall hold other sessions at such times and places as may be necessary for the proper discharge of their duties, or as the convenience of parties in the judgment of the commission may require. The members of said commission shall each receive a salary of two thousand dollars, unless restrained by law from the performance of their duties, to be paid as the salaries of the other state officers. It shall be the duty of the commission to keep a record of all its proceedings, which shall be open at all times to the inspection of the public.

"Sec. 16. Be it further enacted, that all money paid out under this act shall be paid on warrant of the comptroller to the treasurer, as by law provided, including such sum as may be necessary to procure office furniture, stationery, and other office expenses, including rent of office of said commission: provided that such office expenses shall not exceed five hundred dollars per annum.

"Sec. 17. Be it further enacted, that whenever, in the judgment of the railroad commission, it shall appear that repairs are necessary upon any such railroad, or that any addition to the rolling stock, or any addition to or change of the station or station-houses, or any change in the rates of fares for transporting freight or passengers, or any change in the mode of operating the road and conducting its business, is reasonable and expedient in order to promote the security, convenience, and accommodation of the public, they shall give information in writing to the corporation of the improvements and changes which they adjudge to be proper, and a report of the proceedings shall be included in the annual report of the commission to the legislature.

"Sec. 18. Be it further enacted, that the said commissioners shall have the right to pass free of charge in the performance of their duties on all the railroads in this state. That said commissioners shall have general supervision over all the railroads of Tennessee, and shall examine the same from time to time, and keep themselves informed as to their condition, and the manner in·

which they are operated with reference to the security and accommodation of the public, and the compliance of the several corporations with their charters and the laws of the state.

"Sec. 19. Be it further enacted, that said commission shall, as often as they deem it necessary, examine the several railroads in this state, and shall recommend in writing to the several railroad companies, or any of them, from time to time, the adoption of such measures and regulations as said commissioners deem conducive to the public safety and interest.

"Sec. 20. Be it further enacted, that the managers operating the several railroads of this state shall furnish the said commission with all the information required, relative to the management of their respective lines, and particularly with copies of all leases, contracts, and agreements for transportation, with express, sleeping-car, or other companies, to which they are parties, with schedules of tariff rates.

"Sec. 21. Be it further enacted, that the several railroad companies, trustees, or receivers, or other persons operating railroads in this state, be and are hereby required to make annual returns of their business to the board of commissioners on or before the first day of September of each year, made up to the close of business on the thirtieth day of June next preceding, which annual returns shall be made in duplicate in the manner prescribed by said commissioners, upon the blank forms to be furnished by said commissioners to said railroad companies. Any railroad company which shall neglect or refuse to make such terms shall forfeit to the state $100 for each day of such refusal or neglect.

"Sec. 22. Be it further enacted, that every railroad company shall, within twenty-four hours after the occurrence of any accident to a train, attended with serious personal injury, on any portion of its line within the limits of the state, give notice of the same to the railroad commissioners, who, upon receiving such notice, or upon public rumor of such accident, may repair or dispatch one or more of their number to the scene of said accident, and inquire into the facts and circumstances thereof, which shall be recorded in the minutes of their proceedings, and embraced in their annual report.

"Sec. 23. Be it further enacted, that the said commissioners may summon and examine, under oath, such witnesses as they may think proper in relation to the affairs of any railroad company.

"Sec. 24. Be it further enacted, that the board, through their chairman, shall make annual reports to the governor, on or before the first day of December in each year, for transmission to the legislature, of their doings for the year ending on the thirtieth day of June next preceding, containing such facts as will disclose the actual workings of the railway system in this state, and such suggestions as to the general railroad policy of the state as may seem to them appropriate. They shall also submit such recommendations for further legislation upon the subjects of railroads as they may deem necessary or advisable for the interests of the state.

"Sec. 25. Be it further enacted, that the railroad commissioners shall have at all times access to the list of stockholders of every corporation operating a railroad in this state, and may, in their discretion, at any time, cause the same to be copied in whole or in part for their own information, or for the information of persons owning stock in such corporations.

"Sec. 26. Be it further enacted, that it shall be the duty of the railroad commission, by correspondence, conventions, or otherwise, to confer with the railroad commissioners of other states of the Union, and with such persons from states having no railroad commissioners as the governor of such states may appoint, for the purpose of agreeing, if practicable, upon a draft of statutes to be submitted to the legislature of each state, which shall secure such uniform control of railroad transportation in the several states, and from one state into or through another state, as will best subserve the interest of trade

and commerce of the whole country; and said commission shall include in their annual report to the governor an abstract of the proceedings of any such conference or convention.

"Sec. 27. Be it further enacted, that no person holding the office of railroad commissioner shall, during his continuance in office, personally, or through any partner or agent, render any professional services, or make or perform any business contracts with or for any railroad owned or operated in this state, excepting contracts made with such railroad in its capacity as common carrier.

"Sec. 28. Be it further enacted, that nothing in this act contained shall be construed to affect in any manner or degree the legal duties, rights, and obligations of any railroad corporation or other person owning or operating any railroad in this state, or its legal liability for the consequences of its neglect or mismanagement, whether adjudged by said commission to be reasonable, expedient, and proper, or not.

"Sec. 29. Be it further enacted, that none of the provisions of this act shall apply to any railroad now being constructed, or which may hereafter be begun and constructed, in this state, until ten years from and after the completion of such new railroad.

"Sec. 30. Be it further enacted, that witnesses summoned to appear before said commission shall be entitled to the same *per diem* and mileage as witnesses attending the circuit court. Witnesses summoned by the commissioners shall be paid by warrant on the treasury, to be drawn by the comptroller on the certificate of the president of the board, of the amount to which such witness is entitled; witnesses summoned by any party, to be paid by the party by whom they are summoned. And the commissioners are hereby clothed with the same power to enforce the attendance of witnesses as is now possessed by any court of record.

"Sec. 31. Be it further enacted, that this act take effect from and after its passage, the public welfare requiring it.

"Passed March 29, 1883.         W. L. LEDGERWOOD,
"Speaker of the House of Representatives.
"B. F. ALEXANDER,
"Speaker of the Senate.
"Approved March 30, 1883.       WM. B. BATE, Governor."

The bills further averred that the defendants had notified the plaintiff corporations that they would proceed under that act to revise all their tariffs of rates within the state of Tennessee, and alleged that the proposed action of the commissioners, as well as the said legislation, were in violation of the state and federal constitutions in several respects, not necessary to report, as the decision of the court is not based upon them. The constitutional provisions relied upon, together with the averments of the bills pertinent thereto, are sufficiently stated in the opinions.

The defendants filed their *affidavits* in each of the cases, in which they denied the contention of the plaintiffs as to the construction of their respective charters, and the allegations upon which the validity of the passage of the act was attacked, denied that the act in any way violated the constitutional provisions relied on by the plaintiffs, or that they were about to act illegally or in violation of plaintiffs' rights, and explained in detail what they had done under the act in respect of the plaintiffs' roads, and what course of conduct they proposed to pursue. They averred the power of the state to pass

the act, and elaborately detailed certain facts in the conduct of the plaintiffs respectively, to show the necessity of regulation in order to prevent the unreasonable and unjust charges and discriminations of which affiants alleged the plaintiffs had been guilty, including excessive charges beyond the maximum prescribed by the respective charters of the plaintiffs. They also expressed a great desire to exercise their powers under the act with becoming caution and moderation, and in the best of faith to the railroad companies and the public, so that the interests of all should be reasonably promoted and protected.

The circuit judge granted a restraining order, and directed the application for a preliminary injunction to be argued at Nashville before himself and the two district judges of Tennessee.

*Ed. Baxter, East & Fogg, Dickinson & Fraser,* and *Smith & Allison,* for Louisville & N. R. Co.

*Wm. M. Baxter,* for East Tennessee, V. & G. R. Co.

*Vertrees & Vertrees* and *S. F. Wilson,* for defendants.

Before BAXTER, HAMMOND, and KEY, JJ.

BAXTER, J. The complainant, the Louisville & Nashville Railroad Company, claims to be a corporation and citizen of Kentucky, and the defendants are the "railroad commission," appointed under and pursuant to the act of March 30, 1883. The provisions of this act, so far as they are material, will be recited in the progress of this opinion. It is enough, for the present, to say that it purports to vest the defendants with general supervision of all the railroads and railroad operations in Tennessee. The complainant, who owns and operates several railroads in the state, contends—*First,* that said act was not passed in the manner prescribed and according to the formalities required by the constitution, or, if it was, it was not passed in the form in which it has been promulgated; and, *secondly,* if constitutionally enacted, it is repugnant to the state and federal constitutions, and therefore void and inoperative. It furthermore complains that the defendants are about to enforce the same to its great detriment and irreparable injury, and prays for an injunction to restrain the defendants from interfering, under the color thereof, with its property or business. *Per contra,* the defendants insist that the act was regularly passed as promulgated, and that it is, in all of its provisions, within the constitutional prerogatives of the general assembly, and a valid enactment; and that the enforcement thereof by them will be no legal wrong of which the complainant has any right to complain.

Our duty, therefore, is to inquire and determine whether there is any irreconcilable repugnance between the act and the state or federal constitutions. Its first declaration is that all railroads in the state are public highways, over which all persons have equal rights of transportation for their persons and freight, on the payment of a just and reasonable compensation therefor. To this we fully assent.

Railroads have been created mainly for the accommodation of the public and to facilitate the business of the country. They are indispensable to the rapid and cheap transportation of commercial commodities. Under the fostering care and protection hitherto extended to them, they have expanded into huge proportions. With the beginning of this year we had 125,000 miles of road, representing more than $5,000,000,000 of capital, giving employment to 500,000 people, and in the annual receipt of more than $800,000,000 of earnings. They permeate every part of this extended country, and in a large measure monopolize the entire inland carrying business. Everybody, from the very exigencies of business, is compelled to patronize them. In this regard business men are left without any option. If unrestrained by wholesome legislation the public would be very much at their mercy. They could, by unjust discriminations, made under the name of drawbacks, rebates, or other disingenuous pretenses, favor friends and oppress opponents, and so adjust and graduate their rates according to the exigencies of fluctuating markets, as to secure to themselves or those who operate them an undue proportion of advancing prices. It would, therefore, in view of these obvious possibilities, be a humiliating confession to admit that there was no reserved power, either in the court or the legislature, to protect the public against such possible abuses. *We* do not hesitate to affirm the existence of such a power. Every owner of property, however absolute and unqualified his title, holds it subject to the implied liability that the use thereof shall not be injurious to the public. Rights of property, like social and conventional rights, are held subject to such reasonable limitations in regard to their enjoyment as shall prevent them from being injurious to the rights of others, and to such reasonable restraints and regulations, to be established by law, as the legislature may from time to time ordain and establish. It is, in this principle, applicable alike to all kinds of property, generally denominated the "*police power*" of the state, that the authority is found for such control over individuals and corporations, and over their property, as is necessary to insure safety to all and promote the public convenience and welfare. And in the exercise of this reserved authority the legislature may require railroad corporations and persons operating railroads in the state to observe precautionary measures against accident, forbid unjust discrimination and extortionate charges, and, where there is no valid contract to the contrary, prescribe a reasonable maximum of charges for the services to be performed by them, and enforce the same by appropriate pains and penalties. There are many other things that may be lawfully exacted of them, which need not be recapitulated here. The legislature, however, cannot, under the pretense of regulation, deprive a corporation of any of its essential rights and privileges. In other words, the rules prescribed and the power exerted must be within the *police power* in fact, and not covert amendments to their charters in curtailment of their

corporate franchises. Nor can the legislature, in the exercise of this power, make any regulation in contravention of the state or national constitution. Every statute which invades vested rights, inflicts punishment or takes private property otherwise than by due process of law, impairs the obligation of valid contracts, or denies to any one or more persons the equal protection of the law, are unconstitutional and invalid.

Does the act in question violate any of these principles? As we have seen, it assumes to vest the defendants with a general supervision of all railroads and railroad operations in the state, and makes it their duty "to consider and carefully revise the tariffs of charges for transportation," etc., and if, in their judgment, the rate charged by them "is more than a just and reasonable compensation" for the service to be performed, or if such rate "amounts to unjust and unreasonable discrimination" against any person, locality, or corporation, they are to notify said corporations, etc., of the changes necessary to reduce the rate to "a just and reasonable compensation," and to "avoid unjust and unreasonable discrimination," and "when such changes are made or deemed unnecessary," said commissioners are commanded to append a certificate of approval to the schedule of charges so authorized by them, and the rates thus fixed, approved, and certified shall be *prima facie* evidence of the reasonableness and justice of the same; but they are nevertheless subject to revision by juries as will be hereinafter shown. The act does not, in express terms, command railroad carriers to adopt the rates prescribed by the commissioners, but provides that if they shall "exact and receive" more than "a just and reasonable compensation," or "demand more than the rates specified in any bill of lading" issued by them respectively, or shall for their "advantage or for the advantage of any connecting line," or of "any person or locality;" or if such railroad corporation makes any "unjust or unreasonable discrimination," etc., (unless in the fulfillment of an existing contract or some contract to be thereafter made for the purpose of developing some industrial enterprise,) it shall be held *prima facie* guilty of the crime of extortion, as defined by the act, and subjected to the pains and penalties therein imposed; and every "injured" party is authorized to sue for each extortionate charge, and recover "ten times the amount of the damages sustained," and a reasonable fee for his counsel, unless it shall appear that the alleged extortionate charge conformed to the rates fixed by the commission, in which contingency, (if the jury shall entertain the opinion that the rates so fixed are too high or amount to an unjust and unreasonable discrimination,) they are required to find for the plaintiff, but only for his actual damages, excluding the fee to counsel. Furthermore, the commissioners themselves are not bound by the rates prescribed by them. On the contrary, they are charged with the duty of "investigating" and "determining" whether any of the provisions of said act are violated, and whenever satisfied

that violations thereof have occurred, notwithstanding the corpora-
tion may have charged the rates fixed and authorized by them, they
are peremptorily commanded by the statute to bring suits for every
such violation against the offender in the name and for the benefit
of the state; and if upon the trial the jury shall believe from the tes-
timony adduced that the charges are "unjust and unreasonable," or
that they "amount to unjust and unreasonable discrimination," their
verdict must be for the state, and they are required to assess and re-
turn therewith a penalty of not less than $100 nor more than $1,000,
and the court *shall* render judgment therefor.

The complainant insists that the act is too indefinite to sustain a
suit for the penalties therein imposed, the offenses for which said
penalties are to be inflicted not being sufficiently defined. The defini-
tion of the two principal of these offenses, is,—*First*, the taking of
"unjust and unreasonable compensation;" and, *secondly*, the making
of "unjust and unreasonable discriminations." But what is unjust and
unreasonable compensation, and unjust and unreasonable discrim-
ination? And can an action, *quasi* criminal, be predicated thereon?
It was expressly held to the contrary in the case of *Cowan* v. *East Tenn.,
V. & G. R. Co.*, decided a few years since, at Knoxville, (but not re-
ported,) because, as the learned judge said, "it would have to be left
to a jury, upon the proof, to say whether the difference" in the rates
"was discrimination or not," and that the same difference "might in
one instance be held a violation of the law and in another not," thus
making the guilt or innocence of the accused dependent upon the
finding of the jury, and not upon a construction of the act. "This,"
he said, "I think cannot be done." If this decision is authoritative,
it is conclusive of this part of this case. We think the decision clearly
right. Questions as to what is a reasonable time for the performance
of a contract, or reasonable compensation for work and labor done by
one man at the request of another without any stipulation as to the
price to be paid, and other like cases, frequently arise in civil contro-
versies. But the law furnishes, in all such cases, a *standard* of com-
pensation for the guidance of the jury. Without such legal standard
there could be no reasonable approximation to uniform results; the
verdicts of juries would be as variant as their prejudices, and this
could not be tolerated. To thus relegate the administration of the
law to the unrestrained discretion of the jury; to thus authorize them
to determine the *measure* of damages and then assess the amount to
which a plaintiff may be entitled, would inevitably lead to inequalities
and to injustice. Hence, the statute under consideration undertakes
to supply this *desideratum* by which juries are to be governed in the
determination of the questions submitted to them. That standard is
"that no rates or charges for service in the transportation of freight
over any railroad, shall be held or considered extortionate or excessive
under any proceeding under this act, if it appears from the evidence
that the net earnings    *   *   *   from its passenger and other traffic

would not amount to more than a *fair* and *just return* on the value of which such railroads with its appurtenances and equipments to *be assessed for taxation.*"

This definition is somewhat obscure. But, however interpreted, it does not obviate the objection made or mitigate its force, but intensifies pre-existing doubts. The value is to be the amount at which the road, its appurtenances and equipments are "*to be assessed for taxation.*" But what assessment is to govern? The one made before or after the alleged overcharge or prohibited discrimination? The language of the act is, "*to be assessed.*" But we will not tarry here. Suppose the value satisfactorily ascertained, how and upon what basis are the net earnings to be computed? Is the estimate to be based on past receipts, current income, or anticipated earnings? Is the accused corporation to be held to anticipate its future operations, foresee the amount of its receipts and expenditures, and accurately foreknow its future profits and losses, so as to be able to strike a balance in advance of actual results in order to make its charges conform to the requirements of the statute? If so, how far in the future must their foreknowledge extend? These are some of the many difficulties with which railroad companies are to be embarrassed, and against which the act requires them to provide. But we will suppose these to have been successfully surmounted, and another and more obstinate problem remains. These corporations are, in addition to their expenses, allowed to charge at a rate that will insure a "fair and just return" on the value of their property. But what is a fair and just return? This vital question is by the act left to the unqualified and unrestrained discretion of the jury. There is no legal standard erected whereby the jury can measure the amount. One jury may fix it at 2 or 3 per cent. per annum, while another jury may, in view of business contingencies and fluctuating values, allow 6, 8, or 10 per cent., and their action would be so far conclusive as to be beyond the revision of any reviewing court. The facts that the jury are to ascertain are—*First*, the *net* earnings; and, *secondly*, what would be a "fair and just return." The ascertainment of net earnings involves necessarily an inquiry into the gross receipts and expenditures. May the jury revise the expense account, and if so, to what extent? Both the earnings and expenses vary in accordance with the exigencies of business. Are rates to be varied in accordance with the fluctuating fortunes of railroad operations? If so, a charge reasonable in itself and honestly made might be rendered extortionate, and hence criminal, by a reduction of expenses or an unexpected increase of business, or a charge honestly made on the supposition that 5 or 6 per cent. would be fair and just, might be converted into a crime by the verdict of a jury subsequently rendered, based, it may be, upon facts transpiring subsequent to the alleged violation of the law.

We think the property of a citizen—and a railroad corporation is, in legal contemplation, a citizen—cannot be thus imperiled by such

vague, uncertain, and indefinite enactments. The corporations and persons against whom this act is directed can do nothing under it with reasonable safety. They may take counsel of the commission, act upon their advice, and honestly endeavor to conform to the statute. But if a jury before whom they may be subsequently arraigned, shall, in their judgment and upon such arbitrary basis as they are at liberty to adopt, conclude that the commissioners misadvised or that the managers of the accused railroad corporation made a mistake in regulating their charges upon a 5 per cent., instead of a 4 per cent., basis, the honesty and good faith of the accused will go for nothing, and penalty upon penalty may be added until the defendants' property shall be gradually transferred to the public. This cannot be permitted. Penalties cannot be thus inflicted at the discretion of a jury. Before the property of a citizen, natural or corporate, can be thus confiscated, the crime for which the penalty is inflicted must be defined by the law-making power. The legislature cannot delegate this power to a jury. If it can declare it a criminal act for a railroad corporation to take more than a "fair and just return" on its investments, it must, in order to the validity of the law, define with reasonable certainty what would constitute such "fair and just return." The act under review does not do this, but leaves it to the jury to supply the omission. No railroad company can possibly anticipate what view a jury may take of the matter, and hence cannot know in advance of a verdict whether its charges are lawful or unlawful. One jury may convict for a charge made on a basis of 4 per cent., while another might acquit an accused who had demanded and received at the rate of 6 per cent., rendering the statute, in its practical working, as unequal and unjust in its operation as it is indefinite in its terms. No citizen, under the protection of this court, can be constitutionally subjected to penalties and despoiled of his property, in a criminal or quasi criminal proceeding, under and by force of such indefinite legislation.

The act furthermore conflicts with the eighth section of the eleventh article of the state constitution and the fourteenth amendment to the constitution of the United States. The first of these provides that "the legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals, inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals rights, privileges, immunities, or exemptions, other than such as may be by the same law extended to every member of the community who may be able to bring himself within the provisions of such law;" and the last—the fourteenth amendment—prohibits the states from "depriving any person of life, liberty, or property without due process of law, or denying to any person within their jurisdiction the equal protection of the law." It is not necessary for us to undertake, in this case, to define the boundaries or limit the operation of these just con-

stitutional restrictions upon legislative authority. Their general object is to secure to all citizens in like circumstances an equality of legal rights, and to protect minorities and other interests not strong enough to protect themselves against the aggressions of the majority; to restrain all injurious legislative discrimination against persons and property; to compel an equal distribution of the burdens of government upon every citizen, natural or corporate, coming fairly within the purview of the law; and to give to every one an equal right to invoke the remedies prescribed by law for the redress of wrongs done, either to his person, reputation, or property. Such, we say, is the general purpose and intent of these constitutional provisions. The accuracy of this interpretation is not, as we understand, questioned by the defendants. Their contention is that railroad property is, in many respects, peculiar in its characteristics and uses, requiring legislation peculiarly adapted to them, and that to so legislate is not within the prohibitions of the foregoing constitutional guaranties, as, for instance, the enactment of a statute to regulate the running of trains by railroads. We admit the contention that it is competent for the legislature to enact laws for the government and regulation of railroads, and that the same could not be rendered invalid because of their non-applicability to other and dissimilar properties. But it does not follow that the legislature can enact statutes applicable as well to other kinds of property as to railroads, and therein discriminate so as to impose heavier burdens on one than are imposed on the other. Certainly, they cannot so distinguish as between different railroad companies or between railroad corporations and persons operating railroads in competition with them. Nevertheless, the act in question, if valid, has made this discrimination in the most direct and positive terms. Although it professes to provide for the regulation of railroad companies and persons operating railroads in this state; and although both are common carriers by rail, use the same kind of machinery and motive power, are under equal obligations to the public and to their patrons, and compete in business, railroad corporations are thereby burdened with pains and penalties not imposed on persons operating railroads in competition with them. By the first section of the act both are declared amenable to "injured parties" for the causes therein enumerated. But the third section, prescribing penalties in favor of the state, as hereinbefore stated, for charges made in excess of what a jury may subsequently find in manner aforesaid and upon the basis stated, to be more than just and reasonable compensation, or unjust and unreasonable discrimination, is expressly confined to corporations. Under this section, corporations are subject to be sued, harassed, and worried by expensive and ruinous litigation, and to the payment of the penalties and costs therein provided, while persons operating railroads in active competition with them, engaged in the same kind of *quasi* public service and under the same obligations of fidelity and diligence, are exempt therefrom.

Another and like invidious discrimination is contained in section 13. This section makes it the duty of the commissioners to "consider and carefully revise all the tariffs of charges for transportation of any person or corporation owning or operating a railroad in this state," and if, in their judgment, "any such charge is more than just and reasonable compensation for the service for which it is proposed to be made, or if any such charge amounts to unjust and unreasonable discrimination against any person, locality or corporation," the commissioners are to "notify the person or corporation of the changes necessary to reduce the rate to a just and reasonable compensation, and to avoid an unjust and unreasonable discrimination;" and "when such changes are made," or "when none are deemed proper and expedient, the commissioners are to append a certificate of approval to such tariff of charges, and in case such change" suggested by the commission "shall not be made," or if "any charge, subsequently made, shall not conform thereto," said "*corporation* shall be held *prima facie* guilty of extortion." It is *corporations*, and not persons operating railroads, who are to be held *prima facie* guilty of extortion under this section, and it is corporations, and corporations *only*, who can be punished under its provisions, and thus it appears the act is, in its severest features, more exacting and oppressive of corporations than of persons operating railroads, the former being subjected to penalties and to punishment from which the latter are exempt. But the unconstitutional discrimination of this act is not confined to discrimination between railroad corporations and persons operating railroads, but extends to a discrimination between railroad corporations themselves, the twenty-ninth section thereof expressly declaring that "none of its provisions" shall apply to any railroad then being "constructed," or which might thereafter be "begun and constructed in the state," until "ten years from and after its completion." Wherefore this distinction between existing roads and roads to be thereafter built? If the act was a proper regulation, why not apply it to roads to be hereafter built? If the legislature can thus draw the line between different railroads based on the date at which they were or are to be constructed, where and at what point is legislative discrimination to cease? If the legislature can thus discriminate between new and old roads, it can assume any other arbitrary basis in support of invidious legislation, and in this way oppress one interest for the benefit of another; and if it can do this, the foregoing wise and just provisions of the state and national constitutions, intended to secure an equality of rights to every citizen, may as well be eliminated from those sacred instruments.

Notwithstanding the act under consideration professes to regulate railroad operations, it, in effect, places the business of all railroad corporations in the state under defendants' supervision and control. In addition to the authority to revise their tariffs of charges, as hereinbefore shown, the commissioners may, for undisclosed reasons, and

without accountability to any one, give better rates to one corporation than to another. And (section 17) whenever, in their judgment, "it shall appear that repairs are necessary," or that "additional rolling stock" is needed, or "any change of stations or station-houses," or "any change in rates" are desirable, or "change in the mode of operating any road, and conducting its business is reasonable or expedient," the commissioners "shall give information in writing" to the corporation of the "improvements and changes which they may adjudge proper," etc. These powers, in addition to the authority to prescribe rates, include all the incidents pertaining to the absolute ownership of property. In the exercise of them the commission can limit receipts and dictate expenditures, insure prosperity to one company and drive another into bankruptcy, and assume the management and control of the business and operations of every railroad corporation in the state.

But the defendants say that their revisions of tariff rates and suggestions in regard to the methods of conducting business are not obligatory on the railroad corporations; that the statute is advisory and not mandatory in its terms. This is true; upon the face of it, the railroad companies are left to adopt or reject the rates fixed, and ignore the suggestions made by the commissioners. But if they decline to conform to the rates fixed by the commissioners they do so at the peril of subjecting themselves to a multiplicity of suits by the state and by individuals, to be tried by juries interested in the reduction of charges, and upon the anomalous principles declared by the act, which, by force of the *prima facie* effect therein given to the *ex parte* action of the commissioners, reverses the presumption of innocence hitherto accorded to all defendants in criminal or *quasi* criminal proceedings, and casts the burden of exculpation on the accused. That such litigation will follow is not at all problematical; it is certain. The authors of this statute have been careful to place this beyond doubt. It is therein made the imperative duty of the commissioners, in the event any railroad company refuses to adopt the rates to be prescribed by them, to institute and prosecute a suit, as hereinbefore stated, for every overcharge; and the juries called to try them, will, by the express command of the statute, be compelled to find against the defendants and assess the penalties imposed, unless defendants establish by affirmative proof that its *future* net earnings, on the arbitrary basis declared by the act, will not exceed a fair and just return on the value of its property *to be assessed for taxation*, the jury being the exclusive judges of what a fair and just return is. This much is expressly commanded. But "injured parties" are left to the exercise of their own discretion whether they will sue or not. Nevertheless, by way of inducement, the *prima facie* effect given by the act to the judgment of the commissioners supplies them with the requisite proof to sustain their actions, and, as an additional encouragement, the act offers *ten times* the amount of the damages sustained,

and a reasonable attorney's fee, to be paid by the railroad company. No railroad company in the state can successfully cope with the litigation that will inevitably follow a refusal by it to conform to the requirements of the commissioners in the particular mentioned. Through the indefinite terms of the statute, severity and multiplicity of its penalties, the impossibility of determining in advance of the verdict of a jury in the particular case, what is and what is not a violation of its provisions, the power conferred or attempted to be conferred on juries to define the offense and then inflict punishment, coupled with the *ex post facto* effect given to their verdict, involves everything in uncertainty and commits every railroad corporation in the state to the mercy of the commission.  By the slow but certain operation of this statute, the commission can, if they want to, gradually take and appropriate all the railroad property in the state to the public use, without that just compensation provided for by the constitution.  In a word, the commission, under the terms of this act, hold, in so far as railroad corporations are concerned, the issue of life and death as in the hollow of their hands.

Of what avail, then, is the suggestion that the powers of the commission are only advisory?  To whom and in relation to what is their advice to be given?  They speak to the owners of $50,000,000 of railroad property; and, although they may speak in the most deferential language, the companies to whom their gentle admonitions are to be addressed, thoroughly understand and justly appreciate the unlimited authority with which they are clothed by the act, the uncertainties ahead, the dangers with which they are environed, and the ruinous litigation to which they will be exposed if they decline to adopt the suggestions made, and they will, therefore, with a lively sense of their utter helplessness, cravenly submit to the will of the commission, although such submission may remotely involve the company in hopeless insolvency.  Like apprehension would continue them the ready and flexible tools of the power thus placed over them, and the expressed wishes of the commission would, in every instance, be accepted and acted upon as if it was a positive command.  No prescience is requisite to forecast the consequences.  The commission would become the practical managers of all our railroads.  They are to be elected every two years by a popular vote.  In the absence of some radical change of party methods, the commission, to be elected from time to time, would represent and execute the policy of the dominant party, and, unconsciously or intentionally, manipulate this great interest for the benefit of the political organization to which they belong.  Railroad property, on the successful, judicious, and just management of which the future growth and prosperity of the state so essentially depend, would become the prey of the spoilsmen; and an irresponsible oligarchy, far more dangerous to political morals and the business interests of Tennessee than any possible railroad combination, would be firmly established in our midst.

We do not, by these comments, intend to cast any imputation upon the defendants. There is nothing in this record which, in any degree, impugns either their actions or motives. So far as we can see, they have, in good faith, endeavored to perform their duties as they understand them. Our object is simply to point out the extraordinary powers attempted to be conferred by the act, and to indicate the large opportunities which it affords for an abuse of power and an invasion of vested rights under the color of authority; how it is that railroad organizations could be subjected to party service under its provisions and be manipulated as well against as in furtherance of the public interests, and to say, in the language of the supreme court of Tennessee, in the case of *Farnsworth* v. *Vance*, 2 Coldw. 108, that "this tremendous power" does not, as we think, "*lurk* within the principles of legislative power." We repeat, the regulating power of the legislature and the courts is sufficient to compel railroad companies to perform all their undertakings in favor of the public, and to prevent or punish all derelictions of duty. The legislature can enact laws, within constitutional limits, for the regulation of railroads and railroad operations, but it cannot lawfully authorize a commission, by direct or indirect legislation intended to accomplish that end, or necessarily involving that result, to take control of their business and operations. Such legislation would be an unauthorized and unconstitutional invasion of private rights. The act is also, as we think, a regulation of interstate commerce, and to that extent an intrusion upon the exclusive legislative authority of congress. The reasons for this belief will, by special request, be stated by brother HAMMOND.

Other objections to the constitutional validity of the statute, which we think are entitled to grave consideration, have been urged in argument. But as those already discussed are decisive of the case, we do not deem it necessary to further consider or discuss them in this case.

The prayer of complainants for a preliminary injunction will be granted.

HAMMOND, J. It is, in our judgment, a grave misapprehension of the *Granger Cases* to affirm that they support the legislation involved in this controversy. *Munn* v. *Illinois*, 94 U. S. 113; *Chicago, etc., R. Co.* v. *Iowa*, Id. 155; *Peik* v. *Chicago, etc., R. R.* Id. 164; *Chicago, etc., R. R.* v. *Ackley*, Id. 179; *Winona, etc., R. R.* v. *Blake*, Id. 180; *Stone* v. *Wisconsin*, Id. 181; *Shields* v. *Ohio*, 95 U. S. 319. The overshadowing question in those cases, obviously, was that arising out of the claim to entire exemption from all legislative control over their business by the warehousemen and common carriers. This claim they based upon the supposed inviolability of their property rights, and the leading feature of the decisions is that they had not been "deprived of their property without due process of law" by legislation regulating the maximum of charges they might make, because they had, like ferrymen, millers, etc., embarked their property in a busi-

ness affected with a public interest, whereby it ceased to be *juris privati* only. The court said comparatively little upon the subject of interstate commerce in its relation to such legislation, and it is some-understand the language of the court on this topic, but when they what difficult, from the meagre report of the cases, on that point, to are read, in the light of previous and subsequent decisions, on that especial subject, there is no difficulty whatever in reaching a full understanding of its meaning. The decisions amount, we think, only to this—where a warehouseman or common carrier is engaged in the storage of goods or their carriage *within a state, and exclusively within it,* the rates of charges for such business are subject to legislative control by the state, and the fact that such legislation may *indirectly* and *remotely* affect commerce between the states does not invalidate it; because, if congress has, by reason of this indirect and remote relation of such local business to interstate commerce, any right to assert control over what is primarily domestic commerce only, it is to be presumed, until congress acts, that it does not intend to displace the right of the state to control its domestic commerce.

While it does not appear by the report of these cases, it is familiar to all who are informed about the general character of the discussions had over these questions, that the railroad companies have contended, at all times and in all places, that there is such a necessary co-relation and interdependence between domestic commerce by rail within a state and that which is carried on among the states, and between local and through rates of charges for transportation and competitive rates from more or less distant points, that local rates cannot be regulated by the several states, or any one of them, without disturbing disastrously all rates whatever, thereby seriously and directly affecting interstate commerce. It was undoubtedly in reply to this argument that the decisions were directed, and there is no denying that they close the argument and preserve the right of state control, notwithstanding any disturbance it may occasion rates for transportation between the states. But there is a vast difference between that principle and the argument made here in support of this legislation, that until congress chooses to regulate interstate commerce in respect to rates for transportation from one to another state, the states may regulate it, each within its own limits. It is applying the doctrine of the supreme court, in these cases, to an entirely different subject-matter. To say that the state may regulate the rates of transportation for its domestic commerce until congress chooses to exercise any power it may have over that transportation, because of *its more or less* intimate connection with commerce between the states, is one thing, and to say that all rates of transportation on articles in transit within the borders of the states, whether passing between two or more states or not, concern domestic commerce, and are *pro hac vice* subject to state control, is quite another.

One of the learned counsel for defendants seemed to shrink from taking this position at the argument, struggling in the face of the plain language of the act to somewhat confine its operation to local limits, but the other, following the attorney general of Illinois, in *People* v. *Wabash, etc., R. R.* 104 Ill. 476; S. C. 105 Ill. 236, boldly assumed that until congress acts the legislature may regulate *all* rates for carriage "within the state," no matter where the carriage is to be done, on the theory that it is the act of making the charge or rate for transportation that the state condemns or regulates, and not the transportation itself; wherefore its effect on interstate commerce is only indirect. By this counsel mean—for the illustration was put to test the argument—that the state may regulate charges on a car-load of coal coming from the Ohio river at Cincinnati, or Louisville, to Nashville, or passing through the state to Montgomery, so long as the regulation is confined to the charges for transportation over those miles of the route within the boundary of Tennessee. But we do not think this is what the supreme court means in the *Granger Cases.* It is true, counsel say this is only affecting interstate commerce "*incidentally*," but they are driven to this because the supreme court has declared that it can only be so affected. But for that exigency it is probable no ingenuity would suggest that the control of compensation for the carriage of goods was not a direct control of the carriage itself, nor that the control of a part was not as direct in its action as the control of the whole compensation. Nor does it in the least change this result to affirm that it is the act of making an unjust charge or discrimination at which the law is aimed. What is making the charge? Plainly, it is simply the act of contracting for the transportation, and the operation of the law is just as direct when the contract is forbidden, or regulated as to its terms, as when the act of transportation itself is forbidden or only permitted on those terms. It is, in fact, the most direct and, of all regulations, the most vital to that intercourse we call commerce, to control the compensation for that transportation by which an exchange of the commodities is effected; for without the transportation there can be no exchange between different places, and it is therefore the chief element of *interstate* commerce. It is like saying the control of the circulation of the blood for a space of one inch along the aortal trunk affects the victim's life only "incidentally," to say that the control of the rates of compensation of that part of a great line of interstate commerce, lying between the boundaries of a state, so affects that commerce. The injury may be small, but it is none the less direct, and not at all incidental, because it is only slight. And, as the circuit judge well remarked at the argument, if Tennesee may control the rates for interstate commerce within its limits, Kentucky may, and so on until the states have usurped the regulation of the whole matter. Indeed, this act of the legislature seems to be grounded on

this very notion, for we find in section 26 that the railroad commission is constituted a kind of diplomatic agency to accomplish that purpose. It enacts:

"That it shall be the duty of the railroad commission, by correspondence, conventions, or otherwise, to confer with the railroad commissioners of other states of the Union, and with such persons from states having no railroad commissioners as the governor of such states may appoint, for the purpose of agreeing, if practicable, upon a draft of statutes to be submitted to the legislature of each state, which shall secure such uniform control of railroad transportation in the several states, and from one state into or through another state, as will best subserve the interest of trade and commerce of the whole country; and said commission shall include, in their annual report to the governor, an abstract of the proceedings of any such conference or convention."

It was to obviate the necessity for making commercial treaties—and in effect this section is a provision for such treaties—and to avoid the danger, confusion, and disaster certain to result to commerce between the states from this power of sovereign states over that commerce that the exclusive power was conferred upon the federal government "to regulate commerce with foreign nations, and among the several states and with the Indian tribes." Const. art. 1, § 8. This operates as a necessary, wise, and self-imposed limitation upon the otherwise sovereign power of the states over the subject. It is not a police power in any proper sense, and in our judgment much confusion has arisen by so treating it in the struggle to find some method of evading the federal compact to surrender it. It belongs, it may be, to that immense and almost illimitable residuum of governmental power which has not been technically classified; but if it has been, there is no better name for it than that by which it is known among all nations—the commercial power; or, as it is called in the constitution itself, the power to regulate commerce. It is one of the chief functions of all governments to promote and encourage the interchange of commodities and intercourse of the people among themselves and with foreign nations and neighboring states. In the exercise of this power innumerable laws are made, and, in matters relating to the international or interstate concerns of commerce, treaties and compacts are formed, of which the federal constitution is, in this respect, a conspicuous example.

If the interchange or intercourse be "within the state," it is properly called domestic commerce, if from one to another, international, or, as to our Union, *interstate* commerce; and the government may, and often does, where it can control at all, under this power "to regulate commerce," control the instrumentalities of that commerce. There are, to be sure, certain limitations on the power, as on all its other powers, arising out of the laws of private right and private property; but it is too late now to deny, in view of these decisions of the supreme court, that charges for transportation are a matter of public concern, the private property engaged being dedicated, so to speak, to a public use, and the government may therefore exercise

certain legislative control of these charges. But *non constat* that the states may, under our system of government, exercise it. If it be domestic transportation, wholly within the state, they may; nor does it cease to be wholly within because the thing transported has come from without, nor because it may be destined to go, ultimately, beyond the state; but the particular transportation for which the charge is made must be wholly within the state. If it be partly within and partly without, the state cannot regulate that within and leave the federal power to act on that without, but has no control whatever over the charges for such a transportation. It is in the very nature of the thing itself not local or of domestic concern, and the states have no more power by such a construction or characterization to regulate the rates by the uniform legislation suggested by the section of the act just quoted than they have to so regulate the rates of postage or the weights of coins. That congress refrains from establishing such uniform regulation only indicates an expression of the federal will that the rates shall be left to regulate themselves under the ordinary economic laws that govern the commerce between the states. Declamation and argument in favor of the wisdom or necessity for some regulation are appropriate in the halls of congress, at the ballot-box, or wherever the state, as one of the federal units, may bring its power to bear upon the federal will, but they cannot and should not influence the courts, state or federal, to evade or deny this distributive principle of our governmental power over the subject of transporation as an instrumentality of commerce.

Again, to interpret the opinions of the supreme court in the *Granger Cases*, as they are by this act of the Tennessee legislature and the arguments made at the bar interpreted, is to convict the court of an expression of the barest platitude by a declaration, in another form, that an act of a state legislature can have no extraterritorial force; for it amounts to nothing more to hold that when a car-load of merchandise starts across the country from New York to New Orleans, each state may, until congress acts, regulate the charges for its transportation over the rails situated in that state; because, it is apparent that, whether congress has acted or not, neither state could regulate it elsewhere, and this without the least regard to the "domestic" or "interstate" character of the commerce, or to the "direct" or "incidental" effect upon it. Every mile of the route lies in some state, and when each has acted successively on the transportation, whether the action be "direct" or "incidental," and the subject-matter of it "domestic" or "interstate," becomes wholly immaterial, and there is nothing left to support the force of these terms as used in the opinions. But they are full of significance, if we observe the distinction between a transportation that commences in one state and ends in another and one that commences and ends within the limits of a single state. By this act, and the argument in support of it, all distinctions are obliterated and all commerce is forced to become do-

mestic in order that the states may act upon it. While the car-load of goods is in New York it is domestic to that state, and so on as it rolls over each state line to the end. The inexorable logic of the argument, therefore, is that, until congress acts, there is no such thing as interstate commerce in the matter of the transportation of commodities passing in exchange between the states.

This construction ignores the most prominent predication in the opinions of the court on the subject of interstate commerce. In every case of the series affecting railroad transportation, the court affirms with great distinctness the analogy to the *Warehouse Case*, the first of the series. Now, the subject-matter of that case was *storage*, which was held to be wholly within the state, and therefore subject to its regulation as to rates, and this regulation was not to be evaded because some of *the grain* might have come from another state, and might be destined for sale beyond it. We can scarcely imagine interstate storage, and the analogy of transportation to it would be incomplete unless the transportation involved were wholly between points within the state, as it plainly was in the *Shields Case* of the series. But let us imagine an elevator on wheels, and engaged in the storage of grain while passing from one state to another. It may be affirmed on these cases, keeping the analogy in view, that grain received and stored while passing from one point in Illinois to another in the same state was a transaction within that state, and subject to its control. But surely there is nothing in them to justify the claim that for the storage of grain received at Chicago, to be delivered in Detroit, the state of Illinois could regulate for the time consumed in passing through that state, and Michigan for the time in that state. So, as to railroad transportation, keeping again the analogy in view, we do not understand these cases to justify the claim that a state may be measured from east to west and from north to south, as appears in argument has been done by the defendants here, and on the basis of distance within the state regulate the charges for all property and persons passing over the rails within the territorial jurisdiction, but only that the state may regulate local rates on shipments commencing within the state and ending within it, although the article carried may have come from without and be destined to go beyond the state, and although in this remote and indirect way interstate commerce may be involved. For example, a car-load of merchandise shipped at Nashville to Memphis, on a route wholly within the state, may have come from Louisville and may be intended to be sent from Memphis into Arkansas, without affecting the state's power of regulation, but it does not follow if it came from Richmond via Nashville or Memphis *en route* to Arkansas, or to Nashville or Memphis, that the state would have the same power of regulating rates on the distance traveled within the state; and this is the important distinction which this act overlooks.

The court does not say in these *Granger Cases*, and has not elsewhere definitely determined, that congress can ever control or regulate local rates for domestic transportation, as we have above described it, by reason of any remote or indirect influence such regulation may have on interstate commerce, but it does say that until congress assumes that power the states may continue their control. This view of these cases carries out the analogy to storage in a warehouse, and no other is consistent with it. Any argument which disregards this pre-eminently distinctive and descriptive analogy that is the very foundation stone of the opinions in the railroad cases of the series, does the cases injustice and puts them in irreconcilable conflict with every decision the court has made on the subject of interstate commerce, while the construction we give them preserves their harmony with the others. It is proper to remark here that, for the purposes of this judgment, we deem it unimportant to determine whether any particular transportation is to derive its character of locality or domesticity from the *status* of the road over which it passes as lying and having its legal existence only within the state,—in which case all transportation over it might fall within the definition of domestic commerce,—or from the nature of the contract for a carriage which, by its terms, begins and ends at points within the state, without any regard to the *status* of the road. This act makes no distinctions in either aspect of this question, and is equally defective whichever view we take of it, and this whether either or both be correct. Moreover, neither of the plaintiff's roads in the cases we are deciding is local or domestic in the sense above described.

This opinion would be unpardonably incomplete if we did not, in view of the magnitude of the interests here involved, justify our judgment by a careful examination of the adjudications above construed. In the Iowa case it does not appear what particular acts of transportation, if any, were involved. It was an injunction bill by the railroad company to enjoin the prosecution of suits against it; whether those only threatened or already brought does not appear. The opinion is mainly devoted to other questions; but, although there were two railroads connected by a bridge and making, in one sense, a continuous line between two states, and, in that sense, engaged in interstate as well as state commerce, we have the authority of the opinion itself that the plaintiff's roads, "like the warehouse, is situated within the limits of a single state. Its business is carried on there and its regulation is a matter of domestic concern." This being so, all transportation upon it was, in a legal sense, exclusively within the state, and it mattered not that the goods or passengers had come from another state or where they were destined—the transportation was wholly domestic, and the analogy to the storage of grain is complete. It was a local road leased by a foreign corporation, and in contemplation of the opinion, all transportation over it was essentially domestic, and

its interstate commerce was such only in the indirect way in which the grain elevator was engaged in like commerce.

We have the authority of the supreme court of Iowa for this construction, in a decision made long afterwards, declaring the Iowa act unconstitutional, as an attempt to regulate interstate commerce. Says that court:

"The cases of *State* v. *Munn*, 94 U. S. 113, etc., (citing them,) do not appear to us to sanction the validity of acts of the state legislature regulating the transportation of freight and passengers between the states. They merely determine the power of the states to fix reasonable warehouse charges, and reasonable charges for transportation of freight within the boundaries of the states, respectively, and that, when such power is exercised, although it may incidentally affect commerce between the states, yet the laws of the state are not regulations of interstate commerce because of such incidental results. That it was not intended in those cases to uphold legislation like that under consideration in this case it appears to us is conclusively shown by the reasoning in the later cases of *Hall* v. *De Cuir*, 95 U. S. 485, and *Railroad Co.* v. *Husen*, Id. 465." *Carton* v. *Illinois Cent. R. Co.* 59 Iowa, 148, 153; S. C. 13 N. W. Rep. 69; S. C. 22 Amer. Law Reg. 373, and note.

That was a case of the continuous shipment of car-loads of wheat from Ackley, Iowa, to Chicago, Illinois, and a claim for conformity to the rates established by the state act for so much of the distance as lay in Iowa, and the act was held a violation of the commerce clause of the federal constitution.

In the Wisconsin case, the next in the series of the *Granger Cases*, the court mainly deals again with what were evidently considered by all more important questions. Circuit Judge DRUMMOND tells us the question we are considering was scarcely argued at all in the court below, and evidently it was only incidentally considered in the supreme court. *Piek* v. *Railroad Co.* 6 Biss. 177. The Wisconsin act, unlike ours, contained an exception which excluded from its operation all rates of charges for "carrying freight which comes from beyond the boundaries of the state and to be carried across or through the state." Possibly, notwithstanding its terms, the act may have been construed, within the purview of this exception, not to apply to persons and property coming from other states into Wisconsin, or going from that into other states, which was not thought, however, to be its construction in the court below, though the question whether it could so apply under the *State Freight Tax Cases*, 15 Wall. 232, was reserved, and not decided in that court. The opinion of the supreme court says:

"The law is confined to state commerce or such interstate commerce as directly affects the people of Wisconsin. Until congress acts in reference to the relations of this company to interstate commerce it is certainly within the power of Wisconsin to regulate its fares, etc., so far as they are of domestic concern. With the people of Wisconsin this company has domestic relations. Incidentally, these may reach beyond the state. But certainly, until congress undertakes to legislate for those who are without the state, Wisconsin may provide for those within, even though it may indirectly affect those without."

Now, strange to say, the bill in that case attacked the law because the exemption we have noticed was itself a regulation of interstate commerce, on the theory, perhaps, that it gave an advantage to the citizens of the state over those of other states, which is sometimes applied as a test to determine whether a given law be a regulation of interstate commerce. But whether the court had the exemption section of the Wisconsin act in view, and construed the act in reference to it, is not satisfactorily shown. If, however, we turn to the report of the case to see what is meant by "this company" having "domestic relations" with the people of Wisconsin, the analogy of the warehouse case reappears, though not as distinctly as in the other cases. No particular freight charges were involved in the controversy, it being a bill by bondholders and stockholders to enjoin the company from obedience to, and the railroad commissioners from enforcing, the act, and although this Wisconsin company had been consolidated with an Illinois corporation, the court is at the greatest pains to show that it had not ceased by that consolidation to be, in a legal sense, a local road, as the Iowa road had just been held to be. Counsel say in argument here that this was for another purpose in the opinion, which is true, but it is as potential for one purpose as another, and the opinion in the language quoted so treats it by connecting the "domestic relations" of "this company" with the people of Wisconsin to this subject of interstate commerce. There is certainly nothing in the case to show *specifically* that the court held, as we are asked to hold, that a state may regulate fares and freights, for carriage between two or more states, over that portion of the route lying in that state. This construction is purely an inference drawn by those who claim it. We freely admit that, looking alone to this series of cases, and ignoring all others on the subject of interstate commerce, the construction we are giving them is somewhat inferential, but it seems to us the fairest and most reasonable. And this more clearly appears by reference to the report of this case in the court below, and to that of a contemporaneous case under the same statute in the state courts of Wisconsin, in which the pleadings and argument are more fully shown. *Atty. Gen.* v. *Railroad Co.* 35 Wis. 425, 449, 453, 470, 478, 484, 485, 511. The court below complained that the case, now under analysis, was scarcely argued on this point, and for that reason refused to consider it, while in the court above it was thought of so little relative importance that the dissenting opinions do not notice it, and the court disposes of it in a comparatively few lines. And yet, the misconception of these *Granger Cases*, which we are seeking to remove, is undoubtedly the foundation of a belief in the power of the states to legislate, as this act does, without limitation or qualification.

In the next case of the series, the particular character of the transportation involved is not shown, and it is of no importance on this subject; nor do the next two shed any further light on it, except by the constant reference to the *Warehouse Case*. But when we come

to the Ohio case, generally classed as one of the series, we find for the first time that the particular act of transportation is given, and that it commenced and ended within the state.   Going back to the *Warehouse Case*, we find that the language of the court on this subject of interstate commerce seems to have been selected with a purpose to use the case for convenience as an analogy in the subsequent cases affecting railroads.   The court says: "The warehouses of these plaintiffs in error are situated and their business carried on *exclusively within the limits of the State of Illinois.*"   They are likened to the carts and drays transferring grain from one railroad station to another, and their instrumentality in interstate commerce is said to be *incidental.*   Certainly, this cannot be said of either of the roads in the cases we have in hand.   One plaintiff is a Kentucky corporation, extending its road into this state by license of our own laws, presumably, for the primary purpose of interstate commerce.   *Louisville & N. R. Co.* v. *Henry Co.*, (unreported,) by BAXTER, J.; *Callahan* v. *Louisville & N. R. Co.* 11 FED. REP. 536, by KEY, J.   The other road, as shown by the bill, extends into Georgia, Alabama, and Mississippi, and in no sense can they be said to be carrying on their business exclusively within the limits of a single state.   They are not like warehouses, carts, and drays, or purely local roads engaged incidentally in interstate commerce, but are great arteries of intercourse and transportation with neighboring states—as much so as the Tennessee, Cumberland, or Mississippi rivers.   The analogy wholly fails unless we limit the regulation, which this act does not pretend to do, to purely local transportation commencing and ceasing at points within the state; and, even then, it may be doubtful, on these *Granger Cases*, whether the analogy they establish would apply, unless the roads were local in the sense the roads in those cases were held to be, which point we need not determine, as the act itself makes no distinction.

Turning now from the *Granger Cases* to others, and this interpretation of them becomes so plainly the correct one that it seems impossible to resist the conviction that they have been misunderstood in the reliance placed upon them to support this act.   It was held in the *State Freight Tax Case*, 15 Wall. 232, that the transportation, whether by land or water, of commodities from one state to another was interstate commerce, and the prominent idea of such commerce in the minds of the framers of our federal constitution; that its direct regulation is exclusively within the control of congress; that when the subjects of regulation are in their nature national, or admit of uniform regulation, that fact demonstrates the exclusive power of congress over them; and that the state cannot, even in the exercise of its taxing power, jeopardize the freedom of transportation between the states.   That the regulation of rates of charges for such transportation does admit of uniformity, cannot be denied, and certainly not by the advocates of the power to pass this act, since it provides for such uniform regulation by inviting and promoting separate ac-

tion by all the states in the manner therein pointed out. And, if the state may not, by the exercise of its *taxing power*, interfere with the freedom of inter-state commerce, under what power can it act more potentially? Again, if a tax upon a commodity in transit between the states be a direct interference with the freedom of the transportation, can it possibly be said that an act which forbids the carriage by punishing the carrier unless he complies with certain prescribed conditions is any less direct in its action? We think not. The *Granger Cases* and that just cited may be harmoniously reconciled, understood as we have interpreted them, but not as the defendants' counsel and the framers of this act have construed them.

The *Daniel Ball Case*, 10 Wall. 557, and the *Montello Case*, 11 Wall. 411, S. C. 20 Wall. 439, are very clear illustrations of the force and effect of the *situs* of an *instrumentality* of commerce in determining whether the subject-matter of the given regulation be one of domestic concern only incidentally connected with interstate commerce, or a direct instrumentality of that commerce itself, and in the first case is a complete and careful definition of "commerce between the states" and the power of congress over it. We had intended to quote extensively from the opinion, because, more than any other perhaps, it explains the language used in the *Granger Cases*, but since it would prolong this opinion we forbear, and simply invite a careful scrutiny of the case. The distinctions are there pointed out between the domestic commerce, which the states may regulate as well as its agencies, and that interstate commerce which, *as to itself*, they cannot regulate at all, directly nor indirectly, incidentally or otherwise, whether congress has acted or not; but *as to the agencies of which*, until congress acts, there is left to the states almost illimitable control in any department of governmental power, so long as such control affects the commerce itself only incidentally, and does not directly interfere with its freedom. This is the thing secured by the constitutional provision, which is really a treaty or compact for absolute free trade between the states, subject to such uniform regulations as congress alone may impose. And it is doubtful if congress itself could impose one rate for Tennessee and different rates for the other states, as separate action by the states must do.

In another case the supreme court says:

"The fact that congress has not seen fit to prescribe any specific rules to govern interstate commerce does not affect the question. Its inaction on this subject, when considered with reference to its legislation with respect to foreign commerce, is equivalent to a declaration that interstate commerce shall be free and untrammeled." *Welton* v. *Missouri*, 91 U. S, 275, 282.

It is to be noticed in the *Daniel Ball* and *Montello Cases*, *supra*, that there was no question involving the commerce itself, but only an *instrumentality* of it, namely, a steam-boat; the inquiry being whether it was subject to the navigation laws of the United States, and its solution depending on whether Grand Rapid and Fox rivers were do-

*mestic* in the sense that they lay exclusively—like the railroads, in the *Granger Cases*—within the limits of a single state. It was found —and it is worthy of remark that one of them was artificially made so, like railroads—that these rivers were, as a *geographical fact*, not *domestic*, but *interstate* rivers, (if they may be so called,) and that the steam-boats were within the power of congress. But had the fact been the other way, as in the *Granger Cases*, the result would have been the same, so far as the power of congress was concerned, because it was shown that the boats were actually carrying goods between the states, and this fact would support the power of congress, which had acted as to steam-boats so engaged. This was plainly intimated, if not decided. The power of congress to regulate such an *instrumentality of commerce* is practically unlimited, because it may reach the commerce itself as well as its agencies; wherefore, there is no need to look to the character of the regulation in determining the power, but only to the character of the commerce. But when we turn to the power of the states, we must necessarily scrutinize both. The definition of interstate commerce, as given in these cases, does not change; it is fixed whether congress has acted or has not acted, and the real question, as to the states, always is twofold,—does the proposed law act upon the *commerce itself*, or does it act *only* on the *instrumentality?* If the first, it is always void; if the second, its validity depends on the circumstances. Here lies the fallacy of this and all legislation, which overlooks the not always broad distinction between regulating the *commerce itself* and *its instrumentalities*, and we have the authority of the supreme court in the next case cited for saying it is often disregarded. We quote again:

"Commerce with foreign countries and among the states, strictly considered, consists of intercourse and traffic, including in these terms navigation, and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities. For the regulation of commerce as thus defined there can be only one system of rules applicable alike to the whole country, and the authority which can act for the whole country can alone adopt such a system. Action upon it by separate states is not, therefore, permissible. Language affirming the exclusiveness of the great power over commerce as thus defined may not be inaccurate, when it would be so if applied to legislation upon subjects which are merely auxiliary to commerce." *Mobile Co.* v. *Kimball*, 102 U. S. 691, 702.

Can anything be more explicit than this, and does it not apply to this legislative act? The court has repeatedly said, as here, that the transportation of the commodity exchanged is a part of the commerce itself; and if the transit be between two or more states, it is, *ex vi termini*, interstate transportation and interstate commerce. Being so, does not any law which controls the price of the transportation, or restricts it under pains and penalties, affect the commerce itself, and this as directly as possible? It is a delusion to call such a law a regulation of the *instrumentality*, and the delusion is not concealed by naming the process a regulation of railroads or corporations or mo-

nopolies, nor yet by decrying these as instrumentalities which *need* regulation, as no doubt they often do in this regard. It is the instrumentality by which we reach that intangible thing called commerce, and in that sense the instrumentality, and not the commerce, is always regulated; but this confuses the distinction above adverted to by the supreme court.

To illustrate again, take a person engaged in interstate commerce as a carrier on ocean, river, railroad, or highway. If he or his agents be found within the limits of any state violating its laws, he may be arrested and imprisoned; if his property fall under condemnation of the law, it may be seized, although engaged in the commerce; he, his agents and property, and even his receipts for the freight, may be taxed, as well as any special franchise or privilege enjoyed by him, if these taxes be not disguised regulations of commerce. *State Tax Gross Receipts Case,* 15 Wall. 284; *Memphis & L. R. R. Co.* v. *Nolan,* 14 FED. REP. 532. By these and numerous other laws the commerce may be incidentally affected, even to destruction in some cases, through operation upon the *instrumentality* or *agency* alone; and where the carrier is a corporation, there are extended fields for such operation.

But if the carrier in the illustration is engaged in *domestic* commerce, where the state can act *directly* upon it, the capacity for affecting the articles of interstate commerce which may fall into his hands *to be locally transported* is increased; but the effect on *interstate* commerce is still incidental, and although the particular regulation ceases to act on the instrumentality alone, but acts directly on the state commerce itself, yet the distinction between a direct action upon the interstate commerce, and an incidental effect upon it through action upon the instrumentality, remains obvious; for, in such a case, the domestic transportation is itself only an instrumentality, agency, or auxiliary of the interstate commerce, which, until congress act, remains subject to state control. This distinction must be observed in determining what is incidental only in its action on interstate commerce and what is direct; and it runs through all the cases. But when a plain and unmistakable case of direct action on the commerce itself is presented,—as all regulations or restrictions on the contract of transportation must be,—all that need be looked to is the character of the commerce so regulated, and if it be interstate transportation, as defined in the cases cited, regulation or restriction by the state is void. If, for example, as in *Hall* v. *De Cuir,* 95 U. S. 485, the state, exercising its power to secure equal civil rights in the matter of transportation, undertakes to prescribe the privileges a passenger shall enjoy, it is void, although congress has not acted upon that matter, and the passenger be going only between points in the same state. If, again, the state undertake, beyond the scope of vital necessity, to exclude or regulate the entrance of diseased cattle into the state, it is void. *Railroad Co.* v. *Husen,* 95 U. S. 465. And if, under the disguise of an inspection law—the power of inspection being especially reserved to

the states in the federal constitution—the state attempt to exclude or regulate the introduction of passengers thought to be paupers, criminals, etc., it is void. *People* v. *Co. Gen. Transatlantique,* 107 U. S. 59; S. C. 2 Sup. Ct. Rep. 87. And these examples might be multiplied.

It does not advance the argument to invoke the *police power* of the state to support this act of the legislature; for, with noticeable emphasis, it is held in the last two cases cited, as everywhere, that neither in the exercise of its police nor any other power, can the state make a law which is in effect a regulation of interstate commerce. Nor does an appeal to the power of the state over the corporations of its own creation strengthen the argument; for it cannot, by the charters themselves, make regulations of interstate commerce. Such regulation is as void there as elsewhere. *Telegraph Cases,* 96 U. S. 1. If control over the rates be desired by the state under all circumstances, it might possibly secure it by prohibiting its corporations from engaging in interstate commerce in any other way than as domestic roads, and confining them absolutely to the business of transportation within the state, if this would not of itself be an invalid prohibition as a discrimination against interstate commerce. Possibly, when incorporators ask a grant of franchises to enable the company to engage in interstate commerce, and, in consideration of the grant, *agree* not to charge more than a certain *maximum,* or to establish a certain schedule of rates for the trasportation of commodities carried in such commerce, they would be bound by it; but not, be it remembered, because there has been a lawful exercise by the state of a municipal power to prescribe such rates,—for that would be none the less a regulation of interstate commerce, and *as such* void,—but because the incorporators, as owners, with power, in the absence of paramount regulation by law, to prescribe their own rates, have established these. *Consensus facit jus.*

It is obvious, however, in such a case, that the contract cannot be subsequently changed *qua* contract without the consent of both parties, and the remedies for its violation would be those available for a breach of the contract; and where, in the absence of congressional legislation, the consent of the carrier is wanting to any change in the charter, it is inoperative to bind him, not so much because the legislature cannot impair the obligation of a contract as because, without his consent as owner, there can be no regulation at all by state legislation. It being in such case a matter of contract simply, and not of municipal law to regulate the rates, there can grow out of it no enlarged power over interstate commerce, whatever else may grow therefrom. The act *qua* a regulation of interstate commerce is as invalid in the charter of a transportation company as elsewhere in any statute, and necessarily as invalid in any subsequent statute, no matter how full the reservation of power over the charter may have been made.

We need not say that, as to the power to regulate the domestic or local commerce of the company chartered, other principles may come into play. There is no doubt that the fact that our railroads, until recent years, and before the day of consolidations, combinations, trunk lines, and continuous rails were regarded as purely *local* institutions, beginning and ending within the boundaries of a single state, and the further fact that they were all owned by corporations whose migratory capacity was limited and almost denied, have done much to intensify the notion of their still being mere local agencies of commerce. But by active state legislation had for the purpose they have now, for the most part, become continuous avenues of commerce among the states, sweeping over state lines as easily as the Mississippi river rolls along them, and stretching quite as far. We do not see why this fact should not have the same influence it had in *Hall* v. *De Cuir, supra*, and the other cases, and which was suggested by Mr. Justice MILLER in *Gray* v. *Clinton Bridge*, 7 Amer. Law Reg. (N. S.) 149.

The supreme court of Iowa denied validity to the law of that state on the same ground we take, as did also the circuit court of the United States for that state. *Canton* v. *Illinois Cent. R. Co., supra; Kaeiser* v. *Illinois Cent. R. Co.* 18 FED. REP. 151. The case of *Georgia R. R.* v. *Com'rs*, (not yet reported,) did not touch this question, nor does the case in the circuit court of the United States for that state mention it. *Tilley* v. *Railroad Com'rs*, 4 Woods, 427; S. C. 5 FED. REP. 641.

The scope and extent of the principle we are enforcing with the distinctions we have endeavored to point out between the characteristics of federal power over commerce between the states, and the domestic power of the state over the instrumentalities thereof found within its borders, find an illustration in the power of the federal congress, on the one hand, over canals owned and constructed by the state itself, and wholly within it, and on the other, of the state legislature over ships and watercraft in the establishment of liens for domestic supplies furnished in the home port. *In re Boyer*, 3 Sup. Ct. Rep. 434; *The B. & C.* 18 FED. REP. 543; *Escanaba Co.* v. *Chicago*, 107 U. S. 678; S. C. 2 Sup. Ct. Rep. 185; *The Lottawanna*, 21 Wall. 558; *The Illinois*, 2 Flippin, 383.

It is not necessary to go into any more elaborate examination of the cases in the supreme court on this particular subject of interstate commerce, for we are relieved of that necessity by an eminent writer, who has, by his thorough and superior authorship, distinguished himself above the mere book-makers of this day. He has carefully examined and classified the cases in a useful manner, and evidently laments that he cannot find in the rulings of the court any larger jurisdiction for the states over this subject of interstate commerce than he thinks they establish. The cases since Mr. Pomeroy wrote will be cited in a foot-note to this opinion for convenience of consultation. 4 South. Law Rev. (N. S.) 357. See, also, 7 South. Law Rev. 377; 3

South. Law Rev. (O. S.) 656; 13 Amer. Law Reg. (N. S.) 1, 185; 23 Amer. Law Reg. 81; 12 West, Jur. 17; 12 Cent. Law J. 194; Pierce, R. R. 468.

The whole list, from *Gibbons* v. *Ogden*, 9 Wheat. 1, and *Brown* v. *Maryland*, 12 Wheat. 419, to the latest, point with reasonable certainty to the line between valid and invalid legislation by the states. The *Granger Cases* must take their places in this line and conform to it, for there is not the least indication of any purpose to overrule the other cases, and an abundant manifestation in subsequent cases of adherence to them. They show that the states may tax, inspect, police, and in other abundant ways, by the exercise of any kind of power they possess, regulate the agencies and instrumentalities of interstate commerce; they may dig canals, build railroads, improve rivers and harbors, establish ferries, build wharves, construct dams and bridges, and control pilotage; or they may authorize persons and corporations to do these things, and regulate them after they are constructed or established; but neither in their taxation, their inspection, their policing, or other exercise of power, can they by their regulations act directly on the commerce, as these cases define it, between the states. As to that, until congress acts, the commerce must be free.

We do not overlook the argument that this act leaves the carriers free to charge what they please, so long as it is not unreasonable and unjust. Nevertheless it prescribes regulations for determining what is unreasonable and unjust, based on an assumed power over the subject which we have endeavored to show does not exist. The character of the regulation is immaterial where you cannot regulate at all. Carriers cannot charge more than is reasonable and just, but if there be needed any legislation to more effectively determine what is unreasonable and unjust, and to prevent discrimination, it must come from congress in cases like this. We hold, without the least hesitation, after this examination of the subject, that an act of the legislature which attempts, as this does, to regulate, no matter how, *all* transportation over the railroads in this state, and to revise *all* tariffs of charges for transportation over those roads, is, so far as it relates to the plaintiffs in these cases before us, an attempt to control the compensation to be charged by them for the transportation of commodities and persons in transit between two or more states, for that portion of the route lying within this state, and therefore invalid as a regulation of interstate commerce, acting, as it does, in the most direct way possible on that commerce itself. This act makes no discriminations whatever in this regard, and we cannot, by judicial action, insert them in the act by limiting our injunction in respect of the interference of defendants with the charges by plaintiffs for fares and freights in any way. This would be to legislate by judicial decree, for there is nothing in the act to guide us in fixing our limitations. It does not appear that the legislature would have passed this law, or any law, confining its power as we have suggested it is

confined by the federal constitution, or the interpretation we here give that instrument. If the legislature cannot legislate as it has proposed to do, we do not know that it wishes to legislate at all. Cooley, Const. Lim. (4th Ed.) 214–219; *Packet Co.* v. *Keokuk,* 95 U. S. 80; *Neely* v. *State,* 4 Baxt. 174. Hence, we must take the statute as we find it, and restrain the defendants from any action under it as to these plaintiffs.

There are other grounds of fatal objection to this legislation which have been stated by the learned circuit judge in which we all concur; and other questions have been ably argued by counsel, but we do not deem it essential to express any opinion on them because their determination, either way, would not affect our decision on this motion.

Consult *Turner* v. *Maryland,* 107 U. S. 38; S. C. 2 Sup. Ct. Rep. 44; *People* v. *Co. Gen. Transatlantique,* 107 U. S. 59; S. C. 2 Sup. Ct. Rep. 87; *Wiggins* v. *East St. Louis,* 107 U. S. 365; S. C. 2 Sup. Ct. Rep. 257; *Transp. Co.* v. *Parkersburg,* 107 U. S. 691; S. C. 2 Sup. Ct. Rep. 732; *Telegraph Co.* v. *Texas,* 105 U. S. 460; *Bridge Co.* v. *U. S.* Id. 470; *Packet Co.* v. *Catlettsburg,* Id. 559; *Webber* v. *Virginia,* 103 U. S. 344; *Tiernan* v. *Rinker,* 102 U. S. 123; *Lord* v. *Steamship Co.* Id. 541; *Vicksburg* v. *Tobin,* 100 U. S. 430; *Packet Co.* v. *St. Louis,* Id. 423; *Guy* v. *Baltimore,* Id. 434; *Machine Co.* v. *Gage,* Id. 676; *Trade-mark Cases,* Id. 82; *Transp. Co.* v. *Wheeling,* 99 U. S. 273; *Beer Co.* v. *Massachusetts,* 97 U. S. 25; *Cook* v. *Pennsylvania,* Id. 566; *The Telegraph Case,* 96 U. S. 1.

KEY, J. I have not thought it necessary to prepare any opinion in these cases, and am content to announce that I concur in the opinions just read.