*(Circuit Court of Vermillion County.)*

## People

### vs.

## Will J. Davis.

(March 9, 1907.)

1. ORDINANCES—BUILDING ORDINANCE OF CHICAGO IMPOSES NO DUTY. The building ordinance of the city of Chicago in force in 1903 providing that there shall be on the stage of theater buildings certain apparatus and equipment and providing that there shall be certain exits in such buildings imposes no personal duty upon the manager, owner or agent of such theater or upon the officers of the theater company owning the building, and consequently there can be no violation of such ordinance by such person, and the ordinance is void.

2. ORDINANCES—POWER TO PRESCRIBE BUILDING ORDINANCES WITHIN FIRE LIMITS. Under the city and village act the city council may pass a fire limits ordinance prescribing limits within which there shall be no wooden buildings erected, but the city has not the power to fix territorial limits within which the construction of buildings is regulated by ordinance.

3. ORDINANCES—CITIES AND VILLAGES—BUILDING ORDINANCES MUST APPLY TO ENTIRE CITY. In assuming to regulate buildings, the manner of their construction, the materials of which they may be erected, etc., outside of the one question of the erection of wooden buildings within the fire limits, city ordinances must be applicable to all the people of the city, subject them all to the same penalties, and apply to the entire city and not to designated districts within the city.

4. ORDINANCES—DISCRIMINATION IN AS AFFECTING VALIDITY. The city of Chicago, has not the power to enact an ordinance that a theater in one part of the city must provide certain equipment for the protection of human life, while theaters in other parts of the city are not required to provide the same equipment.

5. CITIES AND VILLAGES—BUILDING ORDINANCES—CONSTRUCTION OF. The provisions of the building ordinances of the city of Chicago requiring certain equipment for theaters were made a part of the fire limits ordinance of Chicago for the purpose of protecting and preserving human life, and not for the purpose of preventing the spread of fire or a conflagration.

6. CLASS LEGISLATION. It is not the law that two men· doing precisely the same thing and guilty precisely of the same acts in the same city, can one of them be guilty of murder, and the other not guilty of an ·offense worthy of a fine.

7. ORDINANCES—INDEFINITENESS OF. An ordinance applying only to assembly halls for "large" gatherings of people is void for indefiniteness and uncertainty.

8. ORDINANCES—DELEGATION OF POWER TO NONOFFICIAL BODY. The section in the building ordinance of Chicago prescribing certain equipment to be approved by the board of Fire Underwriters is not rendered void because delegated to a ·nonofficial body, inasmuch as such provision is separable and does not affect the remainder of the section.

9. STATUTES—CONSTRUCTION OF PENAL STATUTES. The rule of construction is that when an offense is claimed to be a violation of a penal statute, that offense must be so plainly stated that he who runs may read.

10. PRACTICE—DUTY OF COURT TO SET ASIDE INVALID INDICTMENT OR DIRECT A VERDICT WHEN CONVINCED OF INVALIDITY OF INDICTMENT. A judge convinced of the invalidity of an indictment upon which a defendant is being tried, would stultify himself and violate his oath of office if he did not set aside the indictment or direct a verdict for the defendant.

11. PRACTICE—CRIMINAL TRIALS—RIGHT OF DEFENDANT TO VERDICT. Where upon a trial upon an indictment after a jury has been empanelled and sworn, the state asks that a *nolle prosequi* be entered, the defendant is nevertheless entitled to a verdict from the jury, if he so demands. After the jury is sworn the defendant is entitled to a verdict.

12. PROXIMATE CAUSE—MANSLAUGHTER—VIOLATION OF ORDINANCES. Semble, upon motion to suppress the introduction of ordinances in evidence upon which indictment for manslaughter is based there are serious questions which could not properly be raised upon the motions, such as the proximate cause of

the death, and whether or not there could be any legal viola-
tion by the mere violation of the city ordinance where no ele-
ment of willfulness or wantonness is alleged.

13. MANSLAUGHTER—INDICTMENT FOR MANSLAUGHTER CANNOT BE SUS-
TAINED WHEN BASED UPON AN ORDINANCE THAT IMPOSES NO
DUTY. Where a building ordinance imposed no duty upon the
defendant to do the things therein required, an indictment for
manslaughter, based upon the omission of the defendant to per-
form the regulations prescribed by the ordinance, cannot be
sustained.

14. MANSLAUGHTER—INDICTMENT FOR MANSLAUGHTER CANNOT BE SUS-
TAINED WHEN BASED UPON VOID ORDINANCE PRESCRIBING FIRE
LIMITS. An indictment for manslaughter cannot be sustained
when based upon omission to obey an ordinance which is void
as beyond the power of the city council, because it attempts to
prescribe building regulations within designated fire limits not
applicable to the entire city.

15. INDICTMENT FOR MANSLAUGHTER BASED UPON VIOLATION OF A CITY
ORDINANCE. The defendant, Will J. Davis, as manager of the
Iroquois Theater at Chicago and as president and director of
the Iroquois Theater Co., was indicted for manslaughter for
omitting to provide certain equipment for the theater and ne-
glecting to conform to certain building restrictions in the con-
struction of the theater building in violation of the building or-
dinances of the city of Chicago Upon trial before a jury upon a
motion to suppress the introduction of the ordinances in evidence
before the jury, *held* that the ordinances were void, (1) because
they impose no duty upon the defendant and (2) because they
were beyond the power of the city to pass since they attempted to
regulate the construction of buildings within designated fire
limits not extending over the entire city. and verdict accord-
ingly was directed for the defendant.

Indictment for manslaughter. Upon trial of case before
a jury upon motion to exclude introduction of ordinances upon
which indictment was based. Verdict directed for defend-
ant. Heard before Judge E. R. E. Kimbrough in circuit
court of Vermilion county.

## STATEMENT OF FACTS.

The defendant Will J. Davis was the manager of the Iro-
quois Theater in Chicago, and president and director of the
Iroquois Theater Company. On December 30, 1903, a fire

broke out upon the stage of the theater among the scenery, and 600 persons who were attending a performance were suffocated and burned to death. The defendant Will J. Davis was indicted for manslaughter, on February 25, 1904, together with Thomas J. Noonan and James E. Cummings. A motion for a change of venue was made by Noonan and Cummings and granted and the case as to them transferred to Peoria county for trial. The opinion upon this motion for a change of venue is reported in *People v. Davis*, 1 Ill. C. C. 191. The defendant Davis moved to quash this indictment and upon February 9, 1905, the indictment was quashed. *People v. Davis*, 1 Ill. C. C. 217. Subsequently upon March 4, 1905, a second indictment for manslaughter was returned against the defendant Will J. Davis, charging him with manslaughter as the result of the same fire. A petition for a change of venue from Cook county on the ground of local prejudice was filed on March 10, 1905, and a motion to quash this second indictment was also filed. This motion to quash was heard in June, 1905, and on January 23, 1906, the motion to quash was denied as to four of the counts and sustained as to two of the counts of the indictment. *People v. Davis*, 1 Ill. C. C. 245. The pending motion for the change of venue was then heard in June, 1906, and upon June 14, 1906, the motion was granted, and the case was transferred to Vermilion county for trial. *People v. Davis*, 1 Ill. C. C. 207. The case was called for trial in Vermilion county in March, 1907, and a jury was selected and empaneled. An opening statement was made to the jury in behalf of the state, and the defense reserved its statement of the case until the close of the plaintiff's evidence. The witnesses present for the state were sworn and one witness was introduced and asked four questions when a motion was made by the defense to compel the state at the inception of the case to introduce the ordinances upon which the indictment was based.

The motion was granted, and the defense thereupon objected to the admission of the ordinances in evidence. After full argument upon behalf of the state and the defense the objection to the admission of the ordinances was sustained.

and the jury were directed to return a verdict of not guilty, which was done and the jury discharged.

The four counts remaining in the indictment after the motion to quash were each based upon alleged violations in different particulars of a certain ordinance of the city of Chicago in relation to buildings. The provisions of the ordinance relied upon were pleaded in each of the counts of the indictment.

The *first count* alleged: That on December 30, 1903, there were certain valid and subsisting laws and ordinances of said city of Chicago, which defined and prescribed the fire limits of said city of Chicago and classified buildings situated therein, and which required theaters of class V to have over the stage a flue pipe of not less than one-thirtieth (1-30) of the total area of the stage, and opened and closed by a circuit battery, with a switch to be placed in the ticket office in the said building and theater, and to have a sign with the words and figures, to-wit: "Move switch," etc., printed on it, and to also have a switch placed near the electrician's stand on the stage in such buildings, and that such buildings should have a system of automatic sprinklers, to be supplied with water from a tank located not less than twenty feet (20) from the highest part of the roof of said building, said sprinklers to be placed above and below the stage in said buildings, and that there should be kept portable fire extinguishers and fire pumps, axes and hooks, and that the owner, agent, lessee or occupants of said building of class V with accommodations for one thousand (1,000) or more people, should employ an expert fireman, and that the owners, lessees and managers of every such building should cause a diagram of said building to be printed on the program of any entertainment to be given in said building, and which said laws and ordinances provided a penalty for any violation thereof, which said ordinances are as follows, to wit:

Sec. 214 [1, 2]: "The fire limits of the city of Chicago are

[1] The references to the sections do not occur in this indictment.
[2] Page 2068 Ordinances of March 28, 1898.

defined as follows: 'The fire liimts of the city of Chicago as defined by existing ordinances, shall be all that part of the city of Chicago bounded by the following limits, excepting the territory lying within the lines commencing at the intersection of  *  *  *.'' (Here follows a detailed boundary of the fire limits by streets.)

"No wall, structure, building or part thereof, will hereafter be built, constructed, altered or repaired within the fire limits of the city of Chicago, except in conformity with the provisions of this ordinance.  *  *  *''.

Sec. 65 [1, 3]: "As a means of reference, buildings erected within the fire limits  *  *  *  shall be divided into classes as follows:  *  *  *  classes IV and V. These shall include all buildings used as assembly halls for large gatherings of people, whether for purposes of worship, instruction or entertainment.  *  *  *''

"Buildings of class IV embrace all buildings in which no movable scenery is used upon the stage thereof."

"Class V embraces all buildings in which movable scenery is used."

Sec. 184 [1, 4]: "There shall be over the stage of every building of class V a flue pipe of sheet metal construction, extending not less than fifteen feet above the highest part of the roof, over the stage of said building, flue shall have an area of at least one-thirtieth of the total area of the stage. The dampers for flue shall be made of metal and opened by a close circuit battery; and switch to be placed in the ticket office and one placed near the electrician's station on the stage, each to have a sign with the words printed on it 'Move switch to left in case of fire to get smoke out of building.' ''

Sec. 185 [1, 5]: "In every building of class V a system of automatic sprinklers to be supplied with water from a tank lo-

---

[1] The references to the sections do not occur in this indictment.

[3] Page 2030 Ordinances of March 28, 1898.

[4] Page 2060 Ordinances of March 28, 1898.

[5] Page 2060 Ordinances of March 28, 1898.

cated not less than twenty (20) feet above the highest part of roof of building. Sprinklers shall be placed above and below the stage; also in paint room, store room, property room and dressing rooms, if they are in or connected with class V building, and not separated by approved double iron doors. Tank not to be connected to stand pipe and ladder system, but to have separate pipe for filling from fire pump, and a 3-inch iron pipe extending from tank to outside building, with siamese connections for fire department use. The entire sprinkler equipment to be approved by the Commissioner of Buildings, Fire Marshal and Board of Underwriters of Chicago."

Sec. 188 [1,6]: "In buildings of class V, and also class IV, where stationary scenery is used, there shall always be kept for use portable fire extinguishers or hand fire-pumps, on and under the stage; in fly gallery and in rigging loft, also at least four fire department axes, two 25-foot hooks, * * * all subject to the approval of the fire marshal."

Sec. 192 [1,7]: "Every portion of any building of class IV and V devoted to the use or accommodation of the public, also all outlets leading to the streets, including the open courts and corridors, stairways and exits, shall be well and properly lighted during every performance, and the same shall remain lighted until the entire audience has left the premises."

Sec. 186 [1,8]: "It shall be the duty of the owner, lessee or manager of every building of class IV and V during the performance, of which programs are issued, to cause a diagram showing the exits of such buildings to be printed on such programs."

Sec. 216 [1,9]: "Any person, firm, company or corporation, who violates, disobeys, omits, neglects or refuses to comply with or who resists or opposes the execution of any of the

[1] The references to the sections do not occur in this indictment.

[6] Page 2061 Ordinances of March 28, 1898.

[7] Page 2062 Ordinances of March 28, 1898.

[8] Page 2061 Ordinances of March 28, 1898.

[9] Page 2068 Ordinances of March 28, 1898.

provisions of this ordinance, shall be subject to a fine of not less than $25 nor more than $200; and every such person, firm, company or corporation shall be deemed guilty of a separate offense for every day such violation, disobedience, omission, neglect or refusal shall continue, and shall be subject to the penalty imposed by this section for each and every separate offense; and any builder or contractor who shall construct any building in violation of any of the provisions of this ordinance, and any architect designing or having charge of such building who shall permit it to be so constructed, shall be liable to the penalties provided and imposed by this section.''

That there was then and there a certain building and theater, called the Iroquois Theater, operated and used for the purpose of giving a certain theatrical performance, and that said building and theater was before then planned, constructed, erected and built for the purpose of giving therein divers theatrical performances; that there was in said building a stage, movable and stationary scenery, and a large auditorium and assembly room, and a large number of seats placed therein for the accommodation and seating of divers persons congregated to witness said theatrical performance; and there was then and there a certain ticket office, where tickets were sold for compensation to divers persons to attend said theatrical performance and that said Iroquois Theater was used as an assembly hall for large gatherings of people for the purpose of instruction and entertainment, and that a large gathering of people was then and there gathered for the purpose of witnessing said theatrical performance and entertainment; and said Iroquois Theater was used as a theater and was a building of class V, situated within the fire limits of Chicago: ''That the said building and theater aforesaid, was then and there owned by the Iroquois Theater Company, a corporation, and was then and there occupied by and in the possession of the said Iroquois Theater Company, a corporation;''

That William J. Davis was then and there the president of

said Iroquois Theater Company, and managing director of the same, and the general manager of said theater and building for said Iroquois Theater Company, ''and was then and there in absolute management and control of said building and theater, with full power and authority to open, close, manage, direct and do all other things within said building and theater as he, the said William J. Davis, then and there might determine;''

That said Davis, as such president, director and manager, was then and there producing and causing to be produced a certain theatrical performance, commonly known as ''Mr. Bluebeard, Jr.'' in said building and said Davis opened said building and theater to the public to witness said theatrical performance, and invited the public for compensation into said building and theater for the purpose of witnessing said production, and there was then and there assembled in said building and theater to witness said performance, to wit, 1,800 persons in response to said invitation; that there was then and there on the stage in said building in use in the production of said theatrical performance a large amount of stationary scenery and a large number of curtains, draperies, borders and drops, and a large number of incandescent lights, spot lights, flood lights, calcium lights, hood lights, open lights, etc.; that said stationary scenery, curtains, borders, etc., were highly combustible; and that there was on said stage and in the said stationary scenery and among said borders and draperies a fire, and because of the combustibility and inflammability of the said scenery, borders and drops, said fire spread among said draperies rapidly, and produced a large amount of smoke, heat, gas and flame; that said laws and ordinances hereinbefore set forth did then and there require said building and theater to be equipped with the appliances, equipments and things in said laws and ordinances, for the purpose of providing means of extinguishing any fires which might occur in said building and theater, or on the stage thereof, and for the purpose of then and there protecting the lives of the people there assembled; that it

was then and there the duty of said Davis, as president, director and general manager of said corporation and as the general manager of said building and theater, then and there in possession and management of said building and theater to use due caution and circumspection in providing for the safety of the lives of the persons then and there assembled, to wit: The public, and it was then and there the duty of said Davis to use due caution and circumspection to protect said persons so assembled from injury and death by fire, and to protect said building and theater from destruction or injury by fire, and to use due caution and circumspection in equipping, providing and supplying said building and theater with equipment, apparatus and things required by the said ordinances of said city; that said Davis was then and there authorized and empowered to furnish, equip and supply said building and theater with said appliances and things required by said laws and ordinances;

That said Davis then and there undertook for and on behalf of said Theater Company to construct, equip, supply and furnish said building and theater with the said appliances, apparatus, equipment and things in said laws and ordinances required; that there was not then and there over said stage a flue pipe extending "not less than fifteen feet above the highest part of the roof over said stage;" and there was not then and there over said stage a flue pipe "having an area of not less than one-thirtieth of the total area of said stage;" and there was not over said stage flue dampers made of metal to be opened by circuit batteries; and there was not then and there a switch placed in the ticket office with the words "Move switch," etc., printed on it; and there was not then and there a switch placed near the electrician's station on the stage with said words printed on it; and there was not then in said building and theater a system of automatic sprinklers supplied with water from a tank located not less than twenty feet above the highest part of said building and theater, nor were sprinklers placed above and below the stage, nor in the fly gallery or rigging loft, nor was there in any

place in said building any portable extinguishers or hand fire-pumps, nor any ax nor hooks on each tier or floor of said stage, nor on any tier or floor of said stage, nor in said building, all of which said Davis then well knew.

That said Davis did then and there "negligently fail and omit" to have in and about said building or theater, or on said stage the matters so required by said laws and ordinances of said city of Chicago; that one Viva R. Jackson was one of the large number of persons assembled in said building and theater to witness said theatrical performance, and that said William J. Davis, while then and there the president, director and general manager of said Iroquois Theater Company and the manager of said building and theater, and of said stage, for and on behalf of said corporation, and then and there in possession, management and control of said theater and building and in behalf of said Theater Company, in and upon the body of her, the said Jackson, did unlawfully, negligently and feloniously and without due caution and circumspection, make an assault, and that said fire on said stage could have been extinguished had there been in said building and on said stage the fire apparatus, appliances, equipment and things required by said ordinances and laws and which said fire could then and there have been extinguished if there had been in said building and on said stage any portable fire extinguishers, or any fire-pumps, as provided by said laws and ordinances, and which said fire could have been extinguished if there had been in said building and theater, over and above said stage, automatic sprinklers as provided by said ordinances, and which said fire could have been extinguished had there been on said stage and in the fly galleries and rigging and loft thereof in said building, any fire hooks and axes as required by said laws and ordinances; but by reason of the lack of fire appliances, equipment and things as aforesaid, and by reason of the lack of portable fire extinguishers, fire-pumps, fire hand-pumps, fire hooks and axes, and automatic sprinklers, said fire was not then and there extinguished and could not then and there

be extinguished; that by reason of said fire being on said stage and in and among said scenery, there was then and there caused a large amount of fire, smoke, heat, gas and flame to be then and there upon and over said stage, and that thereupon, by reason of the lack of any flue dampers and switches, as required by said laws and ordinances, the said large amount and quantity of fire, smoke, heat, gas and flame could not and did not then and there go through the roof above said stage, and was not confined to said stage, and that by reason of the lack of said sprinklers and the water tank as required by said laws and ordinance, said large amount of fire, smoke, heat, gas and flame could not and was not then and there extinguished and put out.

That if there had been the proper flue dampers and switches, said fire, smoke, heat, gas and flame could and would have gotten through the roof over said stage and if there had been sprinklers and a tank above said building, as aforesaid, the said amount of fire, smoke, heat, gas and flame, so being around, about, upon and over said stage, could have been extinguished and put out by the same, and that by reason of the lack of apparatus, equipment, appliances or things so as aforesaid required by the said laws and ordinances, said large amount of fire, heat, smoke, gas and flame was not thrown off through the roof, and was not extinguished, and was not confined to said stage. That the said Davis did by reason of his said neglect by not providing the said apparatus, appliances, equipment and things required by said laws and ordinances for the safety of the persons assembled in said theater, and for the safety of said Jackson, and in not then and there seeing that there was provided the apparatus, and things required for the safety and protection of the life of said Jackson, and by then and there being engaged as aforesaid in his said business in the management, control and possession of said building and theater, without due caution and circumspection, which was his duty then and there to use, unlawfully, negligently and feloniously cause a large amount of fire, smoke, heat, gas and flame to issue, pour and go over

said stage and against and upon said Jackson, whereby the said Jackson was mortally burned and said Jackson was then and there asphyxiated, suffocated, strangled and choked, by which said Jackson died on said December 30, 1903; and that the said death was caused by the negligence of said Davis "by his not then and there seeing that there was then and there provided apparatus, appliances, equipment and things, as aforesaid, as required by the laws and ordinances of the said city of Chicago aforesaid, to be in and about the said build-ing and theater and on said stage as aforesaid, for the pro-tection of the life of said Viva R. Jackson, and by then and there not using due caution and circumspection as afore-said while so being engaged in his lawful business," and that said Davis did then there negligently, unlawfully and feloniously kill and slay, contrary to the statute and against the peace and dignity of the state of Illinois.

The *second count* sets out the same ordinances as the first count, but charged the defendant Davis as the president and director of the corporation and manager and agent of the building and theater and in control and management of said building and theater, with full power and authority, and in management and control of said theater and building and as producing and having produced and causing to be produced and managing the production of said theatrical perform-ance and that he undertook to see that said building was con-structed and equipped.

The *third count* sets out the same ordinances as the first two counts, but differed in alleging that the theater building was in course of erection and not wholly completed and that it was then and there opened and used, and that the defend-ant Davis was the owner and occupant of the building and theater and in possession and control of the same, and that Davis placed the drapery borders and curtains of the scenery so that they came in contact with a light on the stage and were ignited.

The *fourth count* was a restatement in a different way of the first count and set up the same ordinance, but differed in

charging the defendant Davis as manager of the building and theater empowered, authorized and invested with authority by the owners of said building to procure and furnish the apparatus, etc., required by the laws and ordinances referred to, and that he undertook and assumed the duty to furnish, supply and equip said building and stage with the apparatus required by said laws and ordinances, and that he had taken upon himself the care, management and control of the building and theater.

*John W. Keeslar,* state's attorney of Vermilion county, *James J. Barbour,* assistant state's attorney of Cook county, *George T. Buckingham, Walter T. Gunn,* and *Charles Troup,* attorneys for the people.

*Levy Mayer, W. J. Calhoun, Joseph B. Mann, Isaac B. Craig* and *A. S. Austrian,* attorneys for defendant, Will J. Davis.


KIMBROUGH, J. (orally) : [1]

Before attempting to pass upon the question raised by this objection, it seems almost a necessity that I tender to counsel on both sides of this case my hearty thanks for the very able and exhaustive presentation of the law applicable to this case. Never, in my experience at the bar, or upon the bench, have I seen a court more favored by the labor of counsel than I have been in this matter. The vast number of cases which have been cited, not only the decisions of the courts of this state, but practically of nearly all the states of the union, as well as the decisions of the federal courts, have been cited, explained, the salient points pointed out, and everything that would aid the court to a correct solution of the question, has been done by counsel. It seems to me needless to say to attorneys possessing the ability of the attorneys on both sides of this case, that the court cannot consider anything except legal questions. We have nothing to do with

[1] This opinion was rendered orally by Judge Kimbrough immediately after the close of full arguments extending over a period of four days.—Ed.

moral guilt; and moral guilt may exist in contradistinguish-
ment from legal guilt. I will illustrate what I mean, because
it may have application to the principles involved here. If
I should see my friend, Col. Buckingham, with a broken leg,
helpless by the roadside, and I was going upon a journey to
my own business and he should call upon me to bring to him
a surgeon, and I excused myself, and passed on, without ren-
dering him that assistance, and leaving him on the highway
to die, I would unquestionably be guilty—morally guilty—
of murder. But can anybody say I would be guilty of legal
murder? No duty is enjoined on me by the law towards
him. My punishment would be the just censure and reproach
of my fellowmen, but I would not be legally accountable. I
may know that my neighbor is starving, or that his family
are dying for want of physicians and care. I may go on my
way offering him no assistance, refusing to administer to
their wants, and not be legally responsible for that act. In
order to make me responsible, there would have to be a legal
duty enjoined upon me to render or minister to their relief.
If I occupied the position of overseer of the poor, if a duty
was enjoined upon me by law, and probably if I stood in any
contract relationship with them, whereby I owed them a duty
even by contract, more especially if that duty was enjoined
upon me by law, and I then neglected to minister to their
want and to offer them the assistance that the exigencies of
the case required, I believe that I would be legally guilty.

It is also proper, I think, to say, that I did not know the na-
ture of this indictment, even whether it was founded on some
alleged violation of a common law duty, or that it was founded
on an ordinance of the city of Chicago, until some time about
the middle of last week, when a copy of the opinion of Judge
Kavanagh [1] came into my possession. I never saw the in-
dictment. The only knowledge I had of it until the case was
called here, and one counsel handed to me this printed copy
of the ordinance, was the information that I gleaned from the
printed opinion,—the copy of the opinion of Judge Kavanagh

. [1] *People v. Davis*, 1 Ill. C. C. 245.—Ed.

in this case. I read that opinion three times before this case was called for trial, thinking that probably I had not thought of all of the points on which the Judge ruled when he refused to quash the indictment in this case. Of the many points that have been raised herein on this objection, two points at least occurred to me then. Having some little familiarity with the municipal law, gained in the practice, and in filling the office of corporation counsel of this little city, the first thing that I looked for in that ordinance was to see wherein any duty was enjoined in expressed language upon this defendant, and I must confess, however much I may have desired·to have found it, I did not possess sufficient intellect to ascertain wherein that duty is enjoined. I believe the state's attorney will bear me out when I say that I asked him if they had no other law upon which to found this prosecution than that which is cited and relied on in that opinion. That was only upon my own impression of the law governing this case, made without any investigation of the authorities, and only· upon my own recollection of the principles of law which I thought underlaid this indictment. The next question was whether or not it could be the law of the state of Illinois that two men, doing exactly the same act, performing the same service, and guilty of precisely the same negligence, absolutely alike in every respect, brick for brick, shingle or slate for shingle,—everything entering into the construction of a building, every.thing relating to the equipment of the building, and everything lacking that was to be provided, being precisely the same by both men; that one of those men might not be guilty of anything, and the other man be liable to imprisonment in the penitentiary for the term of his natural life.

These two questions occurred to me upon examining this opinion of Judge Kavanagh, although one of them was not alluded to in the opinion, and so far as the opinion discloses, not argued before him,—i. e., whether or not this ordinance was void because it assumed an authority which had not been delegated to the city by the statute. So firmly grounded was

I in the opinion that the city council had no power except that which was expressly delegated to it, and that every ordinance that the city council might assume to pass would have to rest upon some special grant of power to the city, contained in the statute itself, that I could not for a moment believe, and I cannot yet, that there can be any question as to the law upon that subject. Unless that authority is conferred, unless the state has surrendered so much of its sovereignty in express language, and conferred the power upon the city council to legislate in the manner in which it has assumed to legislate, there is no binding force or validity in its enactment.

An ordinance which is commonly called a fire limits ordinance is authorized by one of the sections, or clauses, or rather, of the general section covering the powers of city councils; but I am inclined to agree with counsel for the defense that the limitations contained in this clause, or rather the expression of the powers that the city council have, which are made in that clause, are to the exclusion of other powers not therein expressed. And when it says that the city council may pass a fire limits ordinance in which there shall be no wooden buildings erected, and the further provision of that section or clause which allows the city to condemn a building that is destroyed by fire or use, or otherwise, to the extent of fifty per cent of its value, that that clause cannot be extended beyond the three things embraced within it. That the clause giving to the city council the right to regulate buildings, the preceding clause, as I recollect it, is not by its terms nor has it any clause within that section,—at least none that have been pointed out to me, and I am aware of none,—that gives them the right to circumscribe the territorial limits in which they shall apply.[1]

[1] The sections of the city and village act defining the powers of the city council applicable to the question are as follows: (Rev. St. Ill. ch. 24, art. 5, sec. 62.)

Sub-div. 61. "To prescribe the thickness, strength and manner of constructing stone, brick and other buildings, and construction of fire escapes therein." (301)

While I was carried away, partly, by the splendid argument of Mr. Buckingham, a better argument than I thought any man could have made on that side of the controversy under the law as it stands, and as I understand it, I took home with me from the state's attorney's office the volume of the supreme court reports which contained the decision that he relied on, rendered by Justice Field of the supreme court. (*Barbier v. Connelly*, 113 U. S. 27.) And it seems to me at least clear that those decisions were based upon the fire ordinance of San Francisco, or the board of supervisors, as they are called, and that contained power, and that the constitution and statutes of the state of California gave to the board of supervisors of the city and county of San Francisco, the power to enact any ordinance that is not in conflict with the laws of the state of California. Of course no one will contend—no lawyer I believe—that the decisions cited

Sub-div. 62. "The City Council and the president and trustees of villages for the purpose of guarding against the calamities of fire, shall have power to prescribe the limits *within which wooden buildings shall not be erected or placed*, or repaired, without permission, and to direct that all and any buildings *within the fire limits* when the same shall have been damaged by fire, decay or otherwise, to the extent of 50 per cent. of the value shall be torn down or removed, and to prescribe the manner of ascertaining such damage." , (301)

Sub-div. 63. "To prevent the dangerous construction and conditions of chimneys, fire places, hearths, stoves, stove pipes, ovens, boilers and apparatus used in and about any buildings and manufactories, and to cause the same to be removed or placed in a safe condition when considered dangerous; to regulate and prevent the carrying on of manufactories dangerous in causing and promoting fires; to prevent the deposit of ashes in unsafe places, and to cause all such buildings and enclosures as may be in a dangerous state to be put in safe condition." (301–2)

Sub-div. 66. "To regulate the police of the city or village and pass and enforce all necessary police ordinances." (302)

Sub-div. 78. "To do all acts, make all regulations which may be necessary or expedient for the promotion of health or the supression of disease." (302)

Sub-div. 93. "To regulate and prohibit the keeping of any lumber yard and the placing or piling or selling any lumber, timber, wood or other combustible material *within the fire limits of the city.*" (303)—Ed.

are conclusive upon this question. What is there said is what is commonly called by lawyers, "*dictum.*" The question involved in that case was the federal question as to whether or not the ordinance violated the constitution of the United States in its 14th amendment.

I will be frank to say that the very thing Mr. Calhoun stated in his closing remarks has been in my mind for hours; and that if it was within my power to bring back to life and put the bloom of youth and call life into the cheeks of these young girls, two of whom I personally knew, by incarcerating the defendant in this case in the penitentiary for the term of his natural life, I believe I would do it; but I cannot.

After ascertaining the precise question that was involved in this indictment,—or the questions rather,—(and it is not necessary to suggest that there are other questions which could not be properly raised upon this motion to suppress the introduction of the ordinances, such as the proximate cause of this death, whether or not there could be any legal violation here, by the mere violation of the city ordinance where there was no element of wilfullness or wantonness alleged, not questions that are properly brought within the objection made to the introduction of these ordinances as evidence), I have been confronted with this question of law. The people are denied the right of appeal. In no stage, from the finding of the indictment until the last act in the case has been performed, have the people any right to note an exception or pray an appeal. If the court rules here against the interest of the state, or the rights of the state, that is a finality. Our legislature has never seen fit to confer upon the people the right to take an appeal in a criminal case; and while I have always leaned to the idea it would be desirable to have such a statute that would at least enable the state to test the validity of its indictments, and to test all those questions which might properly be raised in arrest of judgment after a conviction, going to the sufficiency of the indictment, our people have been so jealous in guarding the liberty of the citizen, that they have never permitted the state to take an appeal in

any case. And the only way in which the state or the people can ever have any right to be heard in the supreme court of the state upon this question would be after there had been a trial, a conviction, a motion in arrest of judgment, that motion overruled, and the case taken to the supreme court by the defendant himself. In order to help the state to get such an opportunity, in order to get a judicial decision of the question involved here, this court, believing as I do that the law is as I have stated, would have to stultify himself, render a judgment contrary to his honest convictions as to what the law of the land is, let the case go to final judgment, overrule a motion in arrest of judgment, which I believe would be properly taken, and then allow the defendant to go on and show that I was wrong, as I knew I was wrong, or believed I was wrong, when I did it. Certainly I cannot be asked to so stultify myself and violate my oath.

The rule of construction is that when an offense is claimed to be a violation of a penal statute, that offense must be so plainly stated in the law that he who runs may read. Laws are made for the government of all the people. The man who works in the ditch as well as the trained lawyer and advocate are equally amenable to the law; and that law ought to be so expressed that every citizen may know his duty, and pursue it. And while I know that the decision I am making will be what is called unpopular in the great city of which we are so proud, within our borders, that much will be said in condemnation of it, the fact remains that under the law there is no legal liability, in my judgment, set forth in this indictment, or that can be set forth in any indictment framed upon this ordinance of the city of Chicago.

While it is outside of the record, it has been stated here and is perhaps an ascertained fact, known to us all, that the great city of Chicago itself has recognized the truth of this statement in the revision of its ordinances.

I read the opinion of Judge Green,[1] and he there expressed the same opinion that I had formed last week, before I saw

---

[1] *People v. Davis*, 1 Ill. C. C. 242.—Ed.

the ordinance, and had seen nothing except the opinion of Judge Kavanagh,[1] that in his judgment no indictment could be framed upon this ordinance which would be good.

Judge Landis, of the United States court, sitting in Chicago, as I understand it, has taken the same view,—that this ordinance does not point out any duty.[2] Judge Kohlsaat, I am also informed, has taken the same view of the question.[3] And I agree with those Judges in the view which they take of this ordinance. And while it was contended in the splendid argument made by Mr. Buckingham that the rule of construction in the state of Rhode Island was different from the rule of construction which prevails in the state of Illinois, one of which he claims is strict, and the other is liberal no authority was produced in support of that statement, and it is my judgment and opinion and recollection that he is in error in that statement; that the rule of construction which prevails in the state of Rhode Island is practically the same as that which prevails in the state of Illinois; and that the interpretation put upon the act of the legislature of Rhode Island, which is more nearly analogous to the provisions of the ordinance which has been cited than any other act or ordinance which has been referred to in any of the books,[4] is in harmony with the views I have expressed, and is the one which was followed by Judge Landis,[5] Judge Kohlsaat[6] and Judge Green.[7]

[1] *People v. Davis*, 1 Ill. C. C. 245.—Ed.

[2] *Hunter v. Iroquois Theatre Co.*, U. S. Cir. Ct. N. D. of Ill. unreported.—Ed.

[3] See *McCulloch v. Ayer*, 96 Fed. 178; *Farley v. Speed*, U. S. Cir. Ct. N. D. of Ill. (Jan. 19, 1904) unreported.—Ed.

[4] *Maker v. Slater Mill & Power Co.*, 15 R. I. 112, 23 Atl. 63 (1885); *Beehler v. Daniels*, 19 R. I. 49, 31 Atl. 52 (1895).—Ed.

[5] *Hunter v. Iroquois Theatre Co.*, U. S. Cir. Ct. N. D. Ill. unreported.—Ed.

[6] *McCulloch v. Ayer*, 96 Fed. 178; *Farley v. Speed* (Jan. 19, 1904) unreported.—Ed.

[7] *People v. Davis*, 1 Ill. C. C. 242.—Ed.

Indeed, Judge Kavanagh, in his opinion,[8] expressly states that not only those decisions, but the decision of the United States court, in the case relating to the census,[9] and other cases in courts of high authority were contrary to the views which he expressed in his opinion overruling the motion to quash. The language of the statute which was read here on Wednesday afternoon, if I remember rightly, of the United States, made it the duty of the Census Bureau to obtain the information that was desired by the government with respect to corporations; but failed to specify what officer of the corporation should give the information that might be required by the census official. *U. S. v. Mitchell*, 58 Fed. 993. There one of the officers of the corporation had refused to give the information that was required, information that was deemed necessary by the government for the legislature,—that is, congress,—to have, in order that it might legislate for the general good, and he was indicted, and that indictment was quashed because the statute had failed to specify that it was the duty of the persons named or indicted to give the information required.

Of course, as I stated a moment ago, it would not be possible for me to review with any degree of accuracy all the decisions which have been rendered,—which have been read and offered for my consideration by both sides in this argument.

The other objections which have been urged with apparently more earnestness and sincerity than either of the two objections which I have taken to the ordinance, myself, may be good. I am inclined to agree, however, with the state that the objection which is made to the fire limits is not well taken.[10] I am also inclined to agree with the state that the provision in the ordinance which conferred on the fire marshal, building commissioner and the board of underwriters of

---

[8] *People v. Davis*, 1 Ill. C. C. 245.—Ed.

[9] *U. S. v. Mitchell*, 58 Fed. 993 (1893).—Ed.

[10] It was contended for the defendant that the ordinance prescribing the fire limits for Chicago did not prescribe limits that met, and that there was a gap in the territorial limits which under *Lamb v. City of Danville*, 221 Ill. 119, rendered the ordinance invalid.—Ed.

the city of Chicago, that power, is not void by reason of the fact that the board of underwriters was mentioned.[11]

Upon the question first raised and argued by Mr. Mayer, and argued by Mr. Calhoun in the opening of his argument, i. e., with respect to the use of the word *"large"* there is cast upon this ordinance, to say the least, an element of doubt.[12] Outside of the confidence game case [13] that was cited by Mr. Keeslar, I do not recall any case where the act complained of would amount to a felony where any court has held that language so general in its terms as the word "large" has been sustained, especially in a criminal proceeding. Those of us who are accustomed to the country and the country life and to examining country witnesses well know that in the vernacular of the people, the speech of the people, the term "ordinary gait" or "moderate gait" is a term which we all understand. I venture that nine out of ten of the witnesses who take the stand in the trial of civil cases where the question of the speed of a horse or of a rider is involved would state that he

---

[11] See upon this point the following cases: *Lasher v. People*, 183 Ill. 226; *People v. Election Commissioners*, 221 Ill. 9, 19; *Allardt v. People*, 197 Ill. 501, 510; *Johnstown Cemetery Ass'n v. Parker*, 59 N. Y. S. 821, 60 N. Y. S. 1015; *Shumway v. Bennett*, 29 Mich. 451.—Ed.

[12] It was contended that the ordinance was void for indefiniteness. The following cases were relied on: *City of Vincennes v. Spees*, 74 N. E. 277 (Ind.). *Wooley v. L. & S. R. Co.*, 93 Ky. 223; *Chicago, etc., R. R. Co. v. People*, 77 Ill. 443; *Pardridge v. O'Neill*, 25 Chicago Legal News, 76; *American Posting Service v. City of Chicago*, 35 Chicago Legal News, 35; *City of Chicago v. Gunning System*, 114 Ill. App. 377; *U. S. v. Brewer*, 139 U. S. 278, 288; *State v. West Side Street Ry. Co.*, 146 Mo. 155, 168; *Augustine v. State*, 52 S. W. (Texas) 77; *State v. New Orleans*, 22 S. R. 939 (La.); *McConvill v. Jersey City*, 39 N. J. DL. 38; *State v. Clark*, 69 Conn. 371; *Ex parte Bell*, 21 S. W. 1040 (Tex.); *City of Chicago v. Rumpf*, 45 Ill. 90, 98; *Tozer v. U. S.*, 52 Fed. 917; *U. S. v. Keokuk, etc., Bridge Co.*, 45 Fed. 178; *Louisville & Nashville Railroad Co. v. Commonwealth*, 99 Ky. 132; *Louisville & N. R. Co. v. Railroad Commission*, 19 Fed. 679; *U. S. v. Sharp*, Peters C. C. (118 Fed. Cas. No. 16,264); *Ex parte Andrew Jackson*, 45 Ark. 158; *L. & N. R. R. Co. v. R. R. Com.*, 19 Fed. 679, 681.—Ed.

[13] *Maxwell v. People*, 158 Ill. 248.—Ed.

27

was going at a "moderate gait;" if it was a little more than that at a "right smart gait." We understand by that, I take it at least to be a gait anywhere from four to six miles an hour. Such ordinances have been sustained in Indiana.[14] The policy ordinance which was referred to by Mr. Keeslar,[15] while I am utterly ignorant of what the game of policy is, could not define it, could not give any person any idea as to what it is farther than it is a gambling game of some kind I take it is as well understood by those who belong to the gaming fraternity as the term "game of poker" or "game of euchre."

In every case nearly in which such ordinances have been sustained, there has been that evident difficulty of defining the offense charged. What constitutes disorderly conduct? Why, it is almost as varied as the various members of humanity themselves in a state of intoxication. No person can tell how to define the term "disorderly conduct" so as to cover every case that might arise.[16] So it is with the confidence game, and in nearly every instance in which the books have sustained an ordinance or a statute where those general words and terms have been used, it will be found, I think, that the offense charged was one that was exceedingly difficult of definition. And in nearly every case—all that I recall, at least, except in the confidence game—for offenses that are analogous to our actions for debt and the violation of city ordinances. And while I am free to confess, while I consider the importance of this case, the hundreds and even thousands of homes that have been made desolate and unhappy—if that alone was the only question, I would be inclined to overrule this objection and admit the ordinance; but the fact that that ordinance does not impose a personal duty upon the defendant is a fact that I cannot get away from. It is not my own

14 *Nealis v. Hayward*, 48 Ind. 19.—Ed.

15 *State v. Carpenter*, 60 Conn. 97, 22 Atl. 497; *State v. Flynn*, 63 Conn. 148, 28 Atl. 28.—Ed.

16 Criminal Code Illinois, secs. 55, 56; *Noe v. People*, 39 Ill. 96, 97; *Washburn v. Bloomington*, 32 Ill. App. 245; *Poyer v. Desplaines*, 18 Ill. App. 225.—Ed.

individual judgment but it is the judgment of other courts save Judge Kavanagh alone, where that question has been presented and where nothing but mere dollars and cents were involved, as I understand the suits before Judge Kohlsaat and before Judge Landis, were simply suits for civil damages. Much more then where the punishment is the severest punishment that can be inflicted upon a rational, right-minded man. To any man possessed of the higher instincts of humanity, to any man who loves honor, to any man who loves the good-will and opinion of his fellow man, death is far preferable to imprisonment for life, even the torture of Torquemada, the inquisition with the thumb-screw and rack, all the torture and physical agony to which humanity may be put—death upon the gallows or death by shooting, or death in the chair, are all to be welcomed rather than to be incarcerated in a penitentiary for the term of your natural life where every visitor in the penitentiary can see your shame and your humiliation. Far better is the grave. And when I consider that the possible consequences of this punishment might extend to life and believing as I do believe that this ordinance is void in two respects—so far I mean as imposing any personal penalty upon Mr. Davis; because nowhere in it is the personal duty enjoined upon him to perform the things that are specified in the ordinance, even if it may be held that the ordinance covers the building in question; and because the city of Chicago has not the power to say that a theater in one part of the city does not need any equipment for the protection of human life and that a theater in another part of the city must be provided with those equipments for the protection of human life. Are those provisions in that ordinance for the purpose of preventing the spread of fire or a conflagration, are they part of the Fire Limits' Ordinance of the city of Chicago, or were they injected into that ordinance for the purpose of protecting and preserving human life? It does not seem to me that there can be any argument upon that question. They have been put into the ordinance for the purpose of affording protec-

tion for human life. Can it be said that human life is less sacred on Randolph street within the fire limits prescribed than it is on Clay street, so to speak, without the fire limits? May the 600 or 1,000 or 1,200 people who may live upon Clay street be incinerated and burned and the man in control of it who has been guilty of precisely the same neglect, who has been guilty of precisely the same moral turpitude, be free from punishment or censure and the other man be guilty of an offense that would imprison him in the penitentiary for the term of his natural life? Can that be the law in the state of Illinois? I cannot believe that it is. I know that it ought not to be the law that two men doing precisely the same thing and guilty precisely of the same acts in the same city, in the same community, that one of them should be a murderer in common acceptation and the other not guilty of even an offense worthy of a fine. The legislature certainly never intended, and they have not in express language, I think, at least, ever granted to the city council of the city of Chicago any such authority; and in assuming to regulate buildings, the manner of their construction, the materials of which they may be erected, outside of the one question of wooden buildings within the fire limits, those laws should be applicable to all of the people, subject them all to the same penalties, give them the same privileges and the same rights. This certainly is a government of equal rights, equal privileges, equal duties and equal liabilities. There ought not to be any distinction whereby one man may be imprisoned and another man go scot free for the doing of the same thing. If it is not class legislation, what is it?

And without attempting to go further in the discussion of this question, because I recognize the utter impolicy of it, however much I might like to review all of these decisions and how much I might desire to let the public understand the exact reasons and the precise authorities on which I base those reasons, it is evident to all of you that it is not possible within the time, having the jury here in imprisonment, for me to take the necessary time to review the decisions and cite the

authorities, and I shall content myself without any further comment upon it by sustaining the objection to the interjection of these ordinances.

Mr. Barbour: In view of the court's decision, we ask the privilege of nollying?

Mr. Mayer: No, we object. We understand that that cannot be done.

Mr. Mann: No, we ask the jury be brought in.

Mr. Mayer: I have no disposition to ask for any order that will not be in full compliance with the spirit and effect which your Honor's decision should have.

The Court: This question has arisen frequently in this court: It arose in the first case that it ever was my privilege to try, and I well remember that fact because it was my first criminal case, when the distinguished Judge Davis held that the party was entitled to a verdict if he demanded it—after the jury had been sworn he was entitled to a verdict.

Mr. Barbour: As I understand the rule, if the court please, it is different from your Honor's experience. The calling of the jury and the swearing of the jury—

The Court: I think the legal effect of it is the same. It is a question for the defendant himself to determine.

Mr. Buckingham: There is no question about the jeopardy.

The Court: There is no doubt about that in my mind.

Mr. Mann: Now, we are entitled to a verdict if the court please.

Mr. Mayer: The state's attorney of this county, your Honor, has very manfully and in a very honorable way agreed with us, and I address myself to the state's attorney of this county and his able assistant Mr. Buckingham.

Mr. Barbour: As far as I am concerned, I prefer to address myself to the court instead of anybody else.

Mr. Mann: He is the only one who is listening to you.

The Court: I hope, gentlemen, that none of the amenities that have prevailed in this case so far will be disturbed in any way.

Mr. Mann: No, there will be no fight.

Mr. Mayer: We ask that the jury be brought in and a verdict directed.

(The Court thereupon ordered that the jury be brought into court, and the jury returned to the court room, accompanied by the bailiff and the jurors resumed their seats in the jury-box.)

The Court: Gentlemen of the jury: Upon the conscience of this court must rest the responsibility of this case. Glad indeed would I have been if I could have shifted my responsibility upon your shoulders. During the last three days and a half the court has listened to a very able, learned and fair argument both by the representatives of the state and the representatives of the defendant as to the admissibility of the ordinances of the city of Chicago which are the foundation of this indictment. And after a careful consideration of those questions the court has decided that the ordinance did not impose any legal duty upon this defendant. The state will not introduce any further evidence and the law as stated to you by counsel upon your voir dire was that the presumption of the law was that every man is innocent until the contrary has been shown by the evidence. The state does not desire to offer any evidence before this jury, and under the law as given to you in your examination, it will be your duty to return a verdict of not guilty because there has been no evidence convincing you of guilt. What is your verdict, gentlemen? Is the verdict, guilty, or not guilty?

· The Jurors: Not guilty.

The Court: The defendant will be discharged.

(Applause.)

The Court: That must be stopped instantly. This is a court of justice and the tribunal of the people, and no man has the right to censure or applaud its action unless for just cause.

(To the jury)

Gentlemen of the jury, you are discharged from any further consideration of the case.